Argued December 9, 1948; reargued February 1; reversed and
remanded February 8, 1949

# LAIRMORE *v.* DRAKE AND BOROUGH

202 P. (2d) 473

*McDannell Brown* of Portland, argued the cause for
appellant. With him on the brief was O. G. Larson, of
Portland.

240

*Harvey S. Benson,* of Portland, argued the cause for respondents. On the brief were Benson and Davis and Thomas R. Mahoney, of Portland.

KELLY, J.

Section 1, Laws of Oregon, 1876, now constituting Section 23-928, Vol. 3, O. C. L. A., pp. 132, 133, in so far as it is pertinent to the issues here, is as follows:

> "Each and every person who shall deal, play, or carry on, open or cause to be opened, or who shall conduct either as owner, proprietor, or employee, whether for hire or not, any game of faro, monte, roulette, rouge et noir, lanquenet, rondo, vingtun (or twenty-one), poker, drawpoker, brag, bluff, thaw, or any banking or any other game played with cards, dice, or any other device, whether the same be played for money, check, credits, or any other representative of value, shall be guilty of a misdemeaenor," * * * *.

Section 3, Laws of Oregon 1876, now constituting Section 64-102, Vol. 5, O. C. L. A., p. 40, is as follows:

> "All persons losing money or anything of value at or on any of said games shall have a cause of action to recover from the dealer or player winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost."

Plaintiff, by his complaint comprising thirty-eight causes of action, alleges that between the 15th day of August, 1945, and the 25th day of August, 1946, the defendants operated a business known as "Tiny's Cafe", at No. 8131 North Denver Avenue, within the city of Portland, County of Multnomah and State of Oregon, a gambling place where games of cards were played for money and on all of which games the defendants collected a percentage of the winnings from the winners.

That on or about the following dates, namely: August 23, 1945; August 27, 1945; August 30, 1945; September 6, 1945; September 11, 1945; September 18, 1945; October 7, 1945; October 15, 1945; October 22, 1945; October 29, 1945; November 6, 1945; November 14, 1945; December 12, 1945; January 14, 1946; March 25, and 26, 1946; April 4, 1946; April 8, 1946; April 9, 1946; April 16, 1946; April 30, 1946; May 15, 1946; May 20, 1946; May 23, 1946; May 24, 1946; May 28, 1946; June 3, 1946; June 10, 1946; June 11, 1946; July 13, 1946; August 9, 1946; August 14, 1946; and August 20, 1946, plaintiff played a certain game of cards commonly called stud poker at said gambling place so conducted and operated by defendants. That as a result of playing such games, plaintiff lost in the aggregate the sum of $9,495.00; on all of which moneys defendants collected a percentage from the winners.

It is also alleged in plaintiff's complaint that no part of said loss has been repaid to the plaintiff by the defendants or anyone else.

A judgment is demanded by plaintiff against defendants and each of them in sums aggregating twice the amount of said alleged losses, namely, $18,990.00.

By their answer, defendants denied each and every allegation, matter and thing contained in plaintiff's

complaint. No affirmative matter is alleged in defendants' answer.

The testimony offered by plaintiff disclosed that plaintiff engaged in playing stud poker in defendants' place of business and presented a prima facie showing that thereby he sustained losses as alleged in his complaint.

The defendants did not take part in the games as players; but, through one of their employes, dealt the cards and took from the stakes, which consisted of poker chips theretofore sold by defendants to plaintiff and the other players, from two to ten per cent thereof.

We quote from the testimony of Mr. Fred Griggs:

"Q. (By Mr. Larson) What connection have you with the defendants?
A I worked for them.
Q What kind of work did you do?
A Tended bar."
\* \* \* \* \*

"The Court: As I understand, you went to work for them in November as a bar tender?
A No, I went to work for Mr. Borough and Mr. Drake just before Christmas in '45.
Q (By Mr. Larson) And you worked there a couple of months?
A I worked until the first of March.
The Court: Of '46?
A Of '46.
Q Did you visit their place after that?
A Yes, quite frequently."

This witness testified to the effect that be began to play there in November, 1944, and continued to play there until October, 1947.

In response to a question as to how the games were carried on, Mr. Griggs testified:

"A  Well, you just bought checks and sat down in the game and played, and you quit any time you wished; any time you wanted to quit you could quit."

We quote further from Mr. Griggs' testimony.

"Q  How many would be at each table?

A  Well, it was—sometimes there would be seven; sometimes there would only be four. It was according to how many players there were and how many games was going, and how many there would be at the table. It was according to — — — —

Q  What helpers, if any, did they have in the cardroom, managing the cardroom and handling the business there?

A  Well, all I know of would be the dealers and the floor men.

Q  What did the dealer do?

A  Well the dealer would take a percentage of the house.

Q  And how often did he take the percentage?

A  Well, he would it take it out of the bets as the bets were made.

Q  Each time that a bet was completed?

A  That is right.

Q  How often would a bet be completed, approximately, in a game?

A  That I couldn't say. It was according to how fast they played, how many bets was made and how many raises was made.

The Court: Well, all of you playing there were playing against each other, I suppose?

A  That is right.

The Court: And then you would make a bet and then your neighbor would call that bet, maybe the other fellow would raise it, and then you would call and finally you would get a pot in there?

A  That is right.

The Court: You and your associates?

A That is right.

The Court: And then that pot was in there the dealer would reach in and maybe take out a chip, or something like that, and set it off to the side as the house percentage?

A That is right.

The Court: And then whoever won that pot would take it, and that would just keep repeating?

A Repeating over and over.

The Court: And I suppose the size of the pot, largely, would determine the amount that the dealer would take out of the kitty for the house?

A That is right."

Mr. Frank J. Mitchell, who worked in defendants' place of business in 1945, having begun working there in 1943, testified that he saw plaintiff buy chips.

We quote from Mr. Mitchell's testimony:

Q (By Mr. Larson) Have you seen him buy chips more than once?

A I have seen him buy chips more than once, yes.

Q More than twice?

A Well, I would say I have seen him buy more than twice a few times, maybe.

\* \* \* \* \*

Q Then you would take the house's rakeoff or percentage?

A That is right.

Q How much would you take off as a rule?

A Oh, it would vary from two to ten per cent."

At the suggestion of the court, the defendants, through their counsel, admitted that the testimony of Mr. Griggs and Mr. Mitchell "is true and may be taken as the situation that prevailed at that place."

Mr. Joseph F. Korang testified that he had been in defendants' place of business numerous times and had seen the plaintiff there playing for money; that he observed the amount that the table man there would take off as their rake-off for the house, and that the amount varied; in a smaller pot they would take off less and in a larger pot they would take off more.

At the conclusion of plaintiff's testimony in chief, defendants rested and moved for a directed verdict in favor of defendants. The trial court sustained defendants' motion and directed the jury to return a verdict in favor of defendants, which was done.

We think that the learned and experienced trial judge erred in directing a verdict for defendants.

The statute, above quoted, gives a cause of action to any person losing money at such games as this record discloses were conducted in defendants' place of business against a proprietor for whose benefit such game was played or dealt.

If we assume that the total amount of the pool or kitty from which two to ten per cent was taken by defendants as proprietors, was twice the amount of the stakes or antes deposited by plaintiff under his version of the amount he lost, namely, $9,495.00, there were $18,990.00 from which defendants as proprietors took from two to ten per cent.

If the amount of defendants' "take-out" was limited to two per cent, the aggregate amount taken was $379.80, or an average of $9.99 for each of the thirty-eight games. If, however, the defendants took ten per cent of the aggregate amount of the stakes, the amount so taken was $1,899.00, or an average of $49.97 for each of the thirty-eight games.

Webster defines benefit as that which "contributes to promote prosperity; whatever adds value to prop-

erty; advantage; profit.'' Ballentine's Law Dictionary, p. 146.

■ The defendants contend that the word "or" before the words "such money or thing of value won" should be read as "and". If this were done the statute would provide that the person losing money on the gambling game would have a cause of action against "the dealer or player winning the game, or proprietor for whose benefit such game was played or dealt, *and* such money or thing of value won." Thus read the proprietor would not be liable unless the money won in the game was won for his benefit. He would not be liable if the "take" was from the pot without regard to the winnings. We think there is no reason for a judicial substitution of the word "and" for the word "or" as suggested. The statute, in our opinion, means that an action lies against a proprietor for whose benefit a game is played or dealt, *or* against a proprietor for whose benefit any money or thing of value is won in the game. That is what the legislature said, and there is nothing in the context or the subject matter and no rule of statutory construction which in any way leads to the belief on our part that they meant something different from what they said. The suggested change in language would mean nothing less than a rewriting of the statute, and would pervert the legislative intent.

In construing the applicable statute, effect must be given to the "coordinating particle that marks an alternative" namely the word "or".

The case of *Nagle v. Randall,* 115 Minn. 235, 132 N. W. 266, cited by defendants, deals with a statutory provision, unlike the above quoted provision of the Oregon statute. The Minnesota statute is as follows:

"Every person who, by playing cards, dice or other games, or by betting on the hands or sides of

such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by civil action before any court of competent jurisdiction.'' Section 2967, R. L. 1905. (Quoted in Nagle v. Randall, supra.)

The ''proprietor for whose benefit such game was played or dealt'' is not mentioned in the section of the Minnesota statute which confers the right upon the loser to sue the winner for the money or goods lost in the gambling games so mentioned.

Because the statute is the only basis for recovery in any degree for any money or from any one whomsoever by a player in a gambling game, who has lost instead of winning, the controlling distinction between the Minnesota statute and the Oregon statute is obvious. The Oregon statute by its terms accords, and the Minnesota statute does not accord, to the loser in the games mentioned the right of recovery from the proprietor who derives a benefit from playing such games, or dealing them.

An early Kentucky case reversed the decree of the court of chancery that denied a recovery by the loser from the proprietor who took from the stakes a percentage thereof as in the case at bar; but the applicable Kentucky statute, upon which this case is based, is more extensive and embracive in some respects than the Oregon statute above quoted, although it does not expressly give the right to a loser to recover from the proprietor for whose benefit the game is played or dealt. *Triplett, Jr. v. Seelbach,* &c. 91 Ky. 30, 14 S. W. 948, 12 Ky. L. Rep. 661.

■ On the basis of the admitted facts herein, we hold such that the defendants herein were, as a matter of

law, proprietors for whom the games were played that the "situation that prevailed at that place" was and dealt. When a proprietor through a dealer, takes a percentage directly out of the pot consisting of chips representing money that has been bet on the same, such proprietor is benefited by that "take" and the benefit is directly measured by the amount and extent of the gambling.

It is immaterial whether the benefit that accrued thereby constituted net profit or merely contributed to the payment of expenses, or to the reimbursement of previous expenses, or whether such "take" was given to charity.

■ The essential characteristic of conduct that gives rise to a cause of action under Section 64-102, O. C. L. A., supra, is the direct receipt of funds illegally employed in gambling.

This cause should be submitted to the jury with an appropriate explanation of the meaning of the words "proprietor for whose benefit such game was played or dealt."

Upon the record before us, we are unable to determine the issues of fact presented.

The judgment of the circuit court is reversed and this cause is remanded for further proceedings consistent herewith.