STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CHARLES CURCIO, BENJAMIN LICCHI AND JOSEPH LICCHI, DEFENDANTS-APPELLANTS.

Argued February 11 and 18, 1957—Decided March 11, 1957.

*Mr. Walter D. Van Riper* argued the cause for the defendant-appellant Charles Curcio (*Messrs. Van Riper & Belmont,* attorneys).

*Mr. Leon W. Kapp* argued the cause for the defendants-appellants Benjamin Licchi and Joseph Licchi (*Messrs. Kapp Brothers,* attorneys; *Mr. Herman W. Kapp,* on the brief).

*Mr. Guy W. Calissi,* Bergen County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. William C. Brudnick,* Special Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

BURLING, J. The three defendants were convicted of violations of the narcotic laws of this State in the Bergen County Court, Law Division. They appealed to the Superior Court, Appellate Division, and we certified prior to a review below.

In many instances of appellate review the court's responsibility is to require observance of established rules which are designed to afford a fair trial to the parties involved. The challenge is most keenly felt in the field of criminal procedure where instances of doubt are resolved most favorably to the accused. This not only to rectify injustice for the present but to insure fairness in the future.

Charles Curcio, Benjamin and Joseph Licchi were charged upon three indictments with conspiracy to manufacture, possess, control and sell morphine, heroin and cocaine; the unlawful manufacture and sale of these narcotics; maintaining a dwelling for the keeping and selling of the drugs. The Licchi brothers were found guilty of all these charges; Curcio was convicted on the conspiracy indictment and the unlawful manufacture indictment.

One of the principal witnesses for the State was one John E. Jackson, reputedly a doctor of science and philosophy with degrees from Sorbonne University and the University of Heidelberg. Jackson was ostensibly engaged in research in the fields of industrial and organic chemistry. Actually, he marketed his abilities as a specialist consultant in the manufacture of narcotic drugs to those illegally pursuing the trade.

The evidence would justify the following conclusions: That Jackson was intimately concerned with the alleged operation of the defendants in that he advised them on the procedure for converting morphine into heroin and how to test the purity of the narcotics; that when equipment was needed for the manufacturing process he was the purchasing agent for the defendants and if flaws developed in the production or the product Jackson was called in to remedy the situation.

The record contains evidence that the alleged combine was terminated by the early part of 1955 when federal and

state agents searched the homes of the Licchi brothers. Jackson, according to the testimony produced in the State's case, deserted his comrades prior to this time and had disclosed the alleged operation to police authorities. His testimony was crucial to the State's case.

■ The story which Jackson related was noticeably consistent, and for an elderly man his memory of events that transpired in the relationship with the defendants was remarkable. In view of this it was especially important to the defense to thoroughly test the witness' credibility and because of his own involvement to reveal whatever interest he might have in a conviction of the defendants. In brief, did he buy his peace from the prosecution?

■ Clearly, this was a line of inquiry which the defendants were entitled to exhaust. *State v. Hogan*, 13 *N. J. Misc.* 117 (*Sup. Ct.* 1935), affirmed 115 *N. J. L.* 531 (*E. & A.* 1935); *State v. Black*, 97 *N. J. L.* 361 (*Sup. Ct.* 1922). The philosophy is expounded in *State v. Spruill*, 16 *N. J.* 73, 78 (1954), where Mr. Justice Heher stated:

"The basic question is one of interest. Interest is no longer a disqualification; but it is a circumstance that may be used to impeach the witness. The interest of a party or a witness in the event of the cause is a factor to be considered in assessing his credibility. At common law a witness was rendered incompetent to testify by reason of interest in the outcome of the action; and, while the incompetency has been removed, the bias that such interest would occasion is still to be reckoned with in determining the probative force of the testimony. Every fact or circumstance tending to show the jury the witness' relation to the case or the parties is admissible to the end of determining the weight to be given to his evidence. *Trinity County Lumber Co. v. Denham*, 88 *Tex.* 203, 30 *S. W.* 856 (*Sup. Ct.* 1895); *Wigmore on Evidence* (3d ed.) sections 526, 966."

In *Spruill* the State's witnesses admitted their hope for leniency and favorable consideration, but the trial court failed to bring this factor to the jury's attention; here the court's charge contained the warning, but all inquiry as to hope of reward was forbidden on the cross-examination of Jackson. See *People v. Savvides*, 1 *N. Y. 2d* 554, 154 *N. Y. S. 2d* 885, 136 *N. E. 2d* 853 (*Ct. App.* 1956).

■ There were too many attempts by counsel to approach this proper avenue of inquiry to indicate that the mere phrasing of the question was improper or insufficient. Compare *State v. Vigorito,* 2 *N. J.* 185 (1949). We cite but two examples. Defense counsel sought to elicit any favor which the State might have promised:

> "Q. I am going to ask you this, Dr. Jackson. What arrangements did you make with the prosecution to testify in this case?
> The Court: I will sustain the objection."

or that he might have obtained from federal authorities in view of a pending indictment in the United States District Court for the Southern District of New York (involving a narcotics conspiracy but unrelated to the present case) :

> "Q. Is it not a fact that you are presently testifying in this case against Curcio, my client, and the other defendants, because you have an arrangement or a promise from the Federal Government or its agencies? ♦
> Mr. Calda: If your Honor please, I will object.
> The Court: I will sustain the objection."

Unfortunately, it does not appear whether a formal indictment was lodged in this State against the witness for his activities in the present situation. This fact might have been ascertained from the records in the office of the county clerk. However this may be viewed (*i. e.,* whether it was upon the defense to produce documentary evidence of an indictment), the questions on cross-examination going to Jackson's interest in the cause were proper.

The State now acknowledges that an accomplice-witness may be examined upon indictments growing out of the same transaction to reveal possible favor, *State v. Falconetti,* 32 *N. J. Super.* 191 (*App. Div.* 1954). It contends, however, that the unrelated federal indictment pending against Jackson was not within the permissible scope of inquiry and that in any event the jury was made well aware of the witness' status through summation of defense counsel and the court's charge.

■■ We recognize the State's contention that inquiry into interest or bias so far as potential or pending indictments are concerned is generally limited to the criminal involvement of the witness in the cause in which he is testifying. In the particular circumstances of this case, however, it was proper to inquire of Jackson whether he was hopeful of favor from either of the enforcement agencies for his crucial testimony. Compare *Alberty v. United States,* 91 *F.* 2d 461, 464 (9 *Cir.* 1937) with *Commonwealth v. Mulroy,* 154 *Pa. Super.* 410, 36 *A.* 2d 337 (*Super. Ct.* 1944). The state and federal authorities actively cooperated in the present case. Both of these law enforcement arms were understandably interested in ridding this nefarious narcotics operation from the public scene. For the same reason it is not beyond the realm of possibility that there was instilled in the mind of Jackson the thought of leniency upon the part of both state and federal authorities by his testifying in the instant case. The defendants were entitled to have the jury informed of Jackson's status in the eyes of the law, both from the state's point of view as well as the federal.

The action of the trial court within the principles set forth constituted prejudicial error which was not obviated by the summation of counsel nor the charge to the jury.

Numerous other errors are alleged but only the following require comment.

### a.

■ During the course of the trial two local newspapers reported that Curcio had been twice convicted on narcotic charges, a fact which the jury would not learn unless Curcio had testified and his credibility had been attacked on this basis. *N. J. S.* 2A:81-12. From the start of the trial the court took pains to caution the jury against reading newspaper accounts of the trial. A mistrial was moved and refused. Counsel for the defendants did not poll the jurors to determine if any had read the articles. Nevertheless, we are asked to assume that the men and women of this

jury disregarded the court's instructions and read the account, and thereby became so prejudiced against all the defendants that a tainted verdict could be the only result. We will not indulge in such unfounded assumptions. To hold otherwise would not only unfairly impugn those who conscientiously serve the high responsibility of jury duty but it would also gauge the integrity of a trial to the character of the newspaper coverage. *State v. Bentley Bootery, Inc.*, 128 *N. J. L.* 555, 563 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 386 (*E. & A.* 1943); *State v. Petrucelli*, 37 *N. J. Super.* 1, 8 (*App. Div.* 1955).

### b.

The conspiracy indictment was returned against the instant defendants and also one Borelli and Wilson. Borelli had not been apprehended at the time of trial. The court directed a judgment of dismissal as to Wilson after the State had presented its case. In charging the applicable law on the conspiracy indictment the court stated that in order to find a conspiracy it was necessary to prove that at least two of the three defendants (Curcio, Ben and Joseph Licchi) were involved in the common scheme to violate the narcotic laws.

The defendants contend that this portion of the charge operated to their prejudice. They argue that the jury might have legally found Borelli (who was still at large) and only one of the three defendants on trial guilty of conspiracy. Because of the charge the defendants feel that the jury under such circumstances was prevented from acquitting the remaining two defendants on trial of conspiracy.

In the context of the entire charge the defendants' argument seems one of semantics only. Curcio and the Licchi brothers were all found guilty of the conspiracy charge and this would seem to indicate that the jury did not engage in the analytical avenues of reasoning suggested here. We mention the point only as a helpful guide on the retrial.

### c.

■ Demonstrative evidence, most of which was taken from the home of the Licchi brothers, was placed on a table in the courtroom. There is some dispute as to whether the assemblage was viewed by the jury. It was placed behind a coat rack which in turn was covered with a cloth. At least no objection was taken to the procedure and the trial court stated that both sides had agreed upon the arrangement. Among the items were two revolvers. The potential relevancy of these revolvers does not appear in the record. Defendants assert (and the State does not deny) the revolvers were not part of the State's case, were not offered in evidence, and served to prejudice the defendants.

■ Under the circumstances there was no prejudicial error. We advise state prosecutors to be cautious of the presence of demonstrative articles not admitted into evidence which may unjustly inflame reasonable men. Consider *State v. D'Ippolito*, 19 *N. J.* 540, 548–550 (1955), and cases there cited.

The judgments below are reversed and the cause is remanded for a new trial.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For affirmance*—None.