Argued December 18, 1957, affirmed March 19, petition for rehearing denied April 23, United States Supreme Court denied certiorari October 21, 1958

## STATE OF OREGON *v.* LANGLEY
315 P. 2d 560 ·
323 P. 2d 301

Robert Y. Thornton, Attorney General, and Peter S. Herman, Assistant Attorney General, Salem, for the motion.

PER CURIAM.

The State has moved for an order supplementing the transcript of testimony so as to include proceedings in connection with the selection of and initial admonitions to the jury, which are not included in the bill of exceptions filed here by the defendant-appellant. The defendant, by letter, has advised the court that he has no objection to the supplementation.

For the reasons stated in *Kraft v. Montgomery Ward & Co. et al.,* 65 Ore Adv Sh 323, 315 P2d 558, decided this date, the motion is denied; but the bill of exceptions will be returned to the trial court for amendment in that court upon proper application.

448

*Richard Carney* argued the cause for appellant. On the briefs were Tanner & Carney and William M. Langley, Portland.

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

LUSK, J.

The defendant, William M. Langley, former district attorney of Multnomah County, was indicted upon a charge that he refused and willfully neglected to inform against and diligently prosecute one William B. Nettleton as a person whom he had reasonable cause for believing to have violated the statutes of this state denouncing gambling as a crime. He was found guilty by a jury, and appeals from a judgment imposing a fine of $100 and declaring his office vacant.

The indictment, which was returned by the grand jury February 14, 1957, reads:

"William M. Langley is accused by the Grand Jury of Multnomah County and State of Oregon by this indictment of the crime of wilfully refusing and neglecting as a District Attorney to inform against and diligently prosecute persons guilty of a violation of Section 167.505, Oregon Revised Statutes, committed as follows:

"The said William M. Langley being at all times herein mentioned the duly elected, qualified and acting District Attorney of Multnomah County, State of Oregon, on the 18th day of March, 1955, and continuously at all times thereafter, in the County of Multnomah and State of Oregon, then and there being, and the said William M. Langley then and there having knowledge and reasonable cause to believe that one, William B. Nettleton, on the 18th day of March, 1955, in the County of Multnomah and State of Oregon, then and there being, was then and there wilfully and unlawfully dealing, playing, carrying on and conducting as owner, proprietor and employee, games of twenty one and other games played with cards and dice, a more particular description of which other games so played with cards and dice being to the Grand Jury unknown, all of which said games were then and there played for money, checks, credits and other representatives of value contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon, all of which he, the said William M. Langley, then and there well knew, and the said William M. Langley, as said District Attorney, did then and there wilfully and unlawfully refuse and neglect to inform against and prosecute the sa*di* William B. Nettleton for violating Section 167.505, Oregon Revised Statutes, contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon.

"Dated at the City of Portland, in the County aforesaid, this 14th day of February, 1957."

The statute which the defendant was accused of violating is ORS 167.515, which reads:

"Any district attorney, sheriff, constable, city or town marshal or police officer who refuses or wilfully neglects to inform against and diligently prosecute all persons who they have reasonable cause to believe are guilty of a violation of ORS 167.505, 167.510 and 91.420, shall be punished upon conviction by a fine of not less than $50 nor more than $500, and the court shall declare the office or appointment held by such officer vacant for the balance of his term."

ORS 167.505, referred to in ORS 167.515, provides in part:

"(1) Every person who deals, plays, carries on, opens or causes to be opened, or who conducts either as owner, proprietor or employe, whether for hire or not, any game of faro, monte, roulette, rouge et noir, lansquenet, rondo, vingt-et-un or twenty-one, poker, draw poker, brag, bluff, thaw or any banking or any other game played with cards, dice or any other device, whether played for money, check, credits or any other representative of value, shall be punished upon conviction by a fine of not more than $500, and shall be imprisoned in the county jail, one day for each $2 of the fine and costs, until such fine and costs are paid, but not to exceed one year."

ORS 167.510, also referred to in ORS 167.515, makes it a criminal offense to permit gambling on premises of which the accused is the owner or entitled to possession, and ORS 91.420 likewise therein referred to, is a civil statute of the same general character.

■ The first assignment of error is directed to the court's denial of defendant's motion for a directed verdict of not guilty, based on the ground that the state had failed to prove one of the essential elements of

the charge, namely, that the defendant knew, or had reasonable cause for believing, that William B. Nettleton, named in the indictment, had violated the statutes against gambling. We examine the testimony to determine the merits of this contention. Since we are dealing with a motion for a directed verdict the evidence will be treated in the light most favorable to the state, and conflicts in the testimony are not for our consideration.

The incident which gave rise to this prosecution occurred, not on March 18, 1955, as alleged in the indictment, but on March 25, 1955. A trade association called The Portland, Oregon, Paint, Varnish and Lacquer Association, desiring to raise funds for various civic and charitable purposes, arranged for a "jamboree party" at Jack and Jill's Restaurant located on the outskirts of the city of Portland. The restaurant was reserved by the Association for the evening and the proprietor was to serve dinner for the guests. Mr. Frank Alsop, secretary-treasurer of the Association, acting in its behalf, made an agreement with William B. Nettleton for the furnishing by the latter of gambling paraphernalia to be used at the party. Under the terms of this agreement, after all of Nettleton's expenses were paid, which included the cost of transporting the equipment and the wages of six or seven dealers to be supplied by Nettleton, the net proceeds of the gambling were to be divided equally between Nettleton and the Association. Admission to the party was by invitation, and approximately 200 persons attended. Nettleton received as his share of the profits some $600 or $700, according to varying statements in the testimony. The Association was able to distribute a like amount derived from the same source to various worthy causes.

The gambling apparatus consisted of two 21 tables, a dice table, a crap table, and a big 6 wheel.[1] The defendant and his wife were invited to the party by Mrs. Dorothea B. Anderson, his secretary, whose husband was an employee of General Paint Corporation. The Andersons and Langleys arrived at Jack and Jill's, according to Mrs. Anderson's testimony, about 7:30 P. M. or shortly thereafter. Other testimony fixed the time at about 8:30 or 9. They stayed no longer than 20 minutes. The defendant and his wife testified that Mrs. Anderson had invited them to attend a carnival; that they were disappointed when they arrived because, instead of a carnival, it appeared to be a card party; that neither of them played cards or drank, and so they left and returned to Mrs. Anderson's apartment to play scrabble.

While they were in Jack and Jill's a High Dice table, two 21 tables, and a crap table were in operation. Some chips were being used as well as currency and silver. The defendant walked into the bar room and dining room and came close enough to one of the gaming tables to brush against it. The defendant testified that, aside from the people in his own party, he saw no one whom he knew except a police officer named Dan Mitola, with whom he conversed for a few minutes about a murder case which he was investigating. Nettleton was there in the role of "manager of the operation," but there is no evidence that the defendant knew Nettleton or had ever heard of him until the institution of the investigation which led up to this indictment. The defendant did not directly testify that he did not see gambling in progress while he was at Jack and Jill's

---

[1]Described by a witness as "a big wheel that you spin around and then there's numbers on a cloth and you can bet on the numbers. If the wheel stops on that number, you win."

that evening. He was not asked the question either by his own counsel or by the prosecuting attorney.

Additional testimony was introduced which the state claims shows that the defendant's failure to prosecute Nettleton was influenced by a corrupt motive. Nettleton was an employee of James B. Elkins, a professional gambler. The gambling apparatus furnished to the Association was owned by Elkins, and he also supplied a "bank roll" of $5,000 as the financial backing for the operation—"to guarantee the losses." The money was taken to Jack and Jill's by James L. Jenkins, who was also an employee of Elkins. He was a mechanic, and his job was servicing pinball machines and music boxes for the Service Machine Company, which Elkins owned. The bank roll was "distributed on the tables." Another employee of Jenkins, Bernard Kane, who helped to set up the equipment, acted as a "shill," that is, one "who plays, kind of keeps the game going along when it 'quietens' down."

Elkins was a witness for the state. Besides corroborating other witnesses as to his part in the affair of March 25, 1955—the furnishing of the gambling apparatus and bank roll and the division of the profits —he testified to the following effect concerning his relations with the defendant: His acquaintance with the defendant commenced in 1945 or 1946, when he employed the defendant to do some legal work for him. The defendant was elected district attorney in November 1954 and took office on January 3, 1955, and, shortly prior to the latter event, Elkins, Langley and one Thomas Maloney met in the Olympic Hotel in Seattle and discussed gambling and the division of money. Maloney was a Seattle gambler and race track man. Concerning this meeting Elkins testified:

"Q (By Mr. Wyckoff) Mr. Elkins, will you

state what Mr. Langley said and what you said and what Mr. Maloney said in this conversation in the Olympic Hotel in Seattle.

"A Bill [the defendant] said there would be one more person in the picture, would be Joe McLaughlin. And he mentioned the fact that because Tom was short on money, Tom Maloney—

"THE COURT: That is the first name. Would you give the last names so there won't be any confusion here.

"A Yes, sir. Tom Maloney was short on money. He was going to split what money he got with Tom Maloney and that was agreeable with me.

\* \* \* \* \*

"A (Continuing) Tom Maloney said that we could have craps and 21 and he asked me what we ordinarily had in the after-hour clubs. I told him anything we could get by with.

\* \* \* \* \*

"A I told him anything that we could get by with running, that we ordinarily ran a High Dice game and a 21 game in after-hour clubs.

"Then Mr. Langley told me that he couldn't hire the investigator that he had said he was going to hire. We got—I asked him why not. He said, well, that the teamsters didn't approve of it, I believe. And the talk went from there to prostitution. Tom Maloney wanted me to go meet Ann Thompson. By that time we—there was an argument going on. Mr. Langley sided with me and said that I didn't have to meet with Ann Thompson, we would forget that part of it."

Elkins further testified that around Labor Day of 1955 he was in Langley's home and that they discussed "stags," by which he meant gambling operations similar to the one at Jack and Jill's. During this conversation, according to the witness, "Mr. Langley told me that either I wasn't getting all the stag, all the—those gambling operations of that type or they weren't very

good business. I asked Mr. Langley if he didn't get his share. He said a piddling amount from that operation out there, I believe."

The reference was to the "operation" at Jack and Jill's on March 25, 1955.

Elkins further testified that in September or October 1954, when the defendant was a candidate for district attorney, he and his brother had a meeting with the defendant during which the latter asked "What would we want" and "We told him that actually nothing, that if all it meant was a fine we could make the fine easier or notify us if there was a warrant got out, that would be about enough." Elkins testified that he knew he would get along with the defendant when the latter became district attorney because he put up the money for his campaign—between $7,000 and $10,000; that he paid Maloney $50 a day to run his campaign. He went into further details about the contributions he made towards the campaign, but it is unnecessary for present purposes to recite them here.

In fairness to the defendant it should be stated that he denied in its entirety all of Elkins' testimony tending to show the existence of a corrupt bargain between himself and Elkins.

From the evidence which we have summarized the jury was warranted in finding that the defendant knew that gambling on a large scale was going on in Jack and Jill's on the night of March 25, 1955. The statute imposed upon him the duty "to inform against and prosecute all persons who" he had "reasonable cause to believe" participated in this violation of the law. He did not inform against or prosecute anyone, and he took the position on the trial that gambling to raise money for charitable purposes was not prohibited (a question to be noticed later). As stated, he did not know Nettle-

ton at the time. He testified that he "saw him for the first time in the court room here" and his first knowledge of Nettleton's activities was "after * * * this investigation commenced." This testimony is uncontradicted and is the basis of the claim that the state failed to prove the allegation of the indictment that the defendant had reasonable cause to believe that Nettleton had violated the gambling laws.

The defendant argues that the averment must be proved, either because it is an essential element of the crime, or, if not essential, because it is descriptive of the offense and, therefore, the rule is applicable that a descriptive averment, even though unnecessarily minute, must be proved as laid. See *State v. Dewey,* 206 Or 496, 517, 292 P2d 799.

 It is our view that it was not necessary for the state to have named in the indictment any particular person whom the defendant had failed to prosecute, but that, having named Nettleton, it was incumbent upon it to prove either that he knew or had reasonable cause to believe that Nettleton had violated the gambling laws or could have ascertained the fact by the exercise of reasonable diligence. The question is whether the state succeeded in doing so. We think that, within the true intent and meaning of the statute, the proof is sufficient. The statute evinces a high degree of concern on the part of the legislature with the enforcement of the laws denouncing gambling. The only other statutes, so far as we are advised, which expressly provided for forfeiture of the office of district attorney in a criminal prosecution for failure to enforce the law, relate to the laws prohibiting the sale of cigarettes to minors and similar offenses. ORS 167.275, 167.280. The latter section requires the district attorney or prosecuting officer, if he is "notified or has knowledge of, or reason

to suspect any violation of" such laws to "diligently inquire into the facts of the violation." A like duty is implicit in the language of ORS 167.515. He must "inform against and diligently prosecute all persons who" he has "reasonable cause to believe are guilty of a violation" of the statutes against gambling. Suppose that the district attorney knew that a gambling establishment was in operation in a particular building, but did not know who the proprietor of the establishment was. We think that he would not be heard to defend against a charge of failure to prosecute the proprietor by the plea that he could not inform against or prosecute anyone because he did not know who the offender was, if the evidence showed that he had made no investigation and that an investigation would have disclosed the identity of the proprietor.

Indeed, it is apparent that the general statute defining the duties of the district attorneys would require such an investigation. ORS 8.670 provides:

> "The district attorney shall institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses, when he has information that any such offense has been committed, and attend upon and advise the grand jury when required."

In *Watts v. Gerking*, 111 Or 641, 659, 222 P 318, 228 P 135, 34 ALR 1489, we said of this section (then § 1018, Oregon Laws) that it was not repealed by, but was in accord with, the provisions of the former prohibition law making it the duty of the prosecuting officer to inquire into violations of that law which he knows, or has reason to suspect, have occurred.

Concerning this subject it is said in *State v. Wymore*, 345 Mo 169, 183-184, 132 SW2d 979:

> "Under the rule, if it is the statutory duty of a

prosecuting attorney to commence and prosecute criminal actions, by necessary implication, he should qualify himself to determine, in the exercise of an honest discretion, if a prosecution should be commenced. The only way he can determine the question is to make an investigation of the facts and applicable law. If he determines there should be a prosecution, and determines, in the exercise of an honest discretion, that he should proceed by information, also, by necessary implication, it is his duty to do whatever is necessary, under the law, to authorize the filing of the information. In making an investigation he qualifies himself to make and swear to the information."

In *Speer v. State,* 130 Ark 457, 464, 198 SW 113, where the conviction of a district attorney for neglect of duty in failing to prosecute the operators of a gambling house for felonies was sustained, the court said, in answer to a contention that the evidence was insufficient:

"* * * An ordinary investigation would have discovered the location of gambling houses in many parts of the city, and the paraphernalia and devices used therein. There was no lack of participants in the games, so witnesses were abundant. While the law does not impose the duties of a detective[2] upon a prosecuting attorney, it does impose upon him ordinary diligence in discovering and abating crime."

See, also, *In re Voss,* 11 ND 540, 90 NW 15; *State ex rel. McKittrick v. Wallach,* 353 Mo 312, 182 SW2d 313, 155 ALR 1; 27 CJS 402, District and Prosecuting Attorneys, § 14; Baker and DeLong, "The Prosecuting

---

[2] In *Cunningham v. Umatilla County,* 57 Or 517, 112 P 437, 37 LRA (ns) 1051, this court approved the expenditure of public funds to pay for the services of a detective employed by the county court, at the request of the district attorney, to aid in procuring evidence against violators of the local option law.

Attorney," 24 Am Jour of Criminal Law and Criminology 1025, 1049.

In New Jersey a statute authorizing the appointment of detectives "to assist the prosecutor in the detection, apprehension and conviction of offenders against the law" was pointed to in *State v. Winne*, 12 NJ 152, 96 A2d 63, as emphasizing the investigatory duties of the county prosecutor. It is a fact of common knowledge that for many years the office of district attorney in Multnomah County has employed an investigator. The defendant in this case testified that he employed Maloney, who is referred to in the testimony of Elkins as an undercover agent, and a former FBI agent as an investigator. It is scarcely too much to say that assistance of that kind is absolutely essential to the proper discharge of the duties of a prosecuting officer in a large city.

■ We are dealing with a charge of neglect of duty against a public official whose duty it is to enforce the law. Included therein is the duty of investigation. We hold as a matter of law that, where it is established that the district attorney has actual knowledge of violation of the gambling laws on a particular occasion and that an investigation such as it is his duty to make would have discovered the identity of the violators, such persons are, within the meaning of the statute, persons whom the district attorney has reasonable cause to believe to be violators and whom he cannot refuse and willfully neglect to prosecute without incurring the penalty of forfeiture of his office.

A slight investigation instituted by the defendant would have led to Nettleton as the man who made the deal with Alsop to furnish and set up the equipment for the gambling operation at Jack and Jill's, and who, in the language of ORS 167.505, "conducted" the games

462

as "owner, proprietor or employe." This is too obvious to require elaboration. Certainly, a finding of the jury to that effect would have been based on substantial evidence.

The motion for a directed verdict was properly denied.

■ It is urged that the indictment on its face fails to state facts constituting a crime. The argument is that at the time the indictment was returned, February 14, 1957, no crime had been committed because, according to the indictment, Nettleton violated the law on March 18, 1955, and a prosecution against him would not be barred by the statute of limitations until the expiration of two years, or March 18, 1957 (citing ORS 131.110), approximately a month after the indictment was returned. Therefore, it is said, the defendant still had a month after the return of the indictment in which to file an information against Nettleton, and, as long as that situation existed, he could not be said to have willfully neglected his duty. The gist of the contention is that the indictment alleges a crime which was not committed until after the indictment was returned.

■ The statute of limitations applicable to a violation of the gambling laws bars prosecution of the offender after the statutory period has run, but it does not provide a like period in which a district attorney may decline to perform his known duty before he may be found guilty of nonfeasance as defined in ORS 167.515. The authorities cited in the defendant's brief in support of the contrary view are so wide of the mark that it would be idle to discuss them. We have seen no case in which the contention has been advanced, and, therefore, none in which the question has been discussed. But we think it entirely obvious that the district attorney's duty arises when he has reasonable cause to

believe that the law has been violated. He has, of course, a reasonable time in which to act, and, whether he has willfully neglected to discharge his duty must be in most cases, as it was in this, a question for the jury to be determined in view of all the relevant circumstances. If the state is in possession of evidence which shows that the district attorney has refused or has willfully neglected to prosecute persons who he has reasonable grounds to believe have violated the gambling laws, it would be absurd to say that the state must wait until the statute of limitations against such violation has run before it can proceed against the faithless official. Nonfeasance such as a jury could have found in the present case is a continuing offense which commences, as we have said, when the duty arises and is willfully neglected. See *State v. Hozer*, 19 NJ 301, 312, 116 A2d 193; *In re Messano*, 16 NJ 142, 149, 106 A2d 537; *State v. McFeeley*, 136 NJL 102, 106, 54 A2d 797, 800.

■ The testimony of Elkins about his relations with the defendant was objected to by the defendant and the overruling of the objection is assigned as error. In our opinion the evidence was clearly relevant and material, as it tended to show the existence of a corrupt bargain between Elkins and the defendant under which the latter would use his office to protect the former in his illicit business. It further tended to show the defendant's knowledge of the gambling at Jack and Jill's on the night of March 25, 1955, and that he profited by it.

It is urged, however, that evidence of corrupt conduct of an officer proves malfeasance and is, therefore, not admissible under an indictment for willful neglect, or nonfeasance. Many decisions are cited in the defendant's brief in support of this contention, but, in our opinion, they fall far short of holding what is claimed

for them. They recognize, of course, the distinction between misfeasance, malfeasance and nonfeasance. The briefest definition of nonfeasance is "doing nothing." *State v. Winne,* supra, 12 NJ at 179. It is generally defined as "the total omission or failure of an officer to enter upon the performance of some distinct duty or undertaking required by his office." *State v. Miller,* 32 Wash2d 149, 152, 201 P2d 136. Malfeasance means evil doing, the doing of an act which is wholly wrongful and unlawful. *State v. Miller,* supra; *State v. McRoberts,* 207 Ind 293, 298, 192 NE 428; *State ex rel. v. Coleman,* 115 Fla 119, 125, 155 So 129. "Misfeasance means the improper doing of an act an officer might lawfully do; or, in other words, it is the performance of a duty in an improper manner." *State v. Miller,* supra. Some of the decisions which are, apparently, especially relied on by the defendant involve a question of jurisdiction. Thus, in California a statute authorizes the Superior Court to take jurisdiction of an accusation by a private citizen against an officer charging him with nonfeasance. But for "willful and corrupt conduct in office" (malfeasance) accusation must be made by the grand jury. In *Siebe v. Superior Court,* 114 Cal 551, 46 P 456, it appeared that a private citizen presented to the Superior Court an accusation in writing charging that the assessor for the city and county of San Francisco had grossly underassessed the property of the Market Street Railway Company in order to enable the company to evade taxation upon the full cash value of its property. The act charged was held not to be "a refusal or neglect" by the assessor to perform official duty, but a "willful and corrupt misconduct in office." The defendant did make the assessment but corruptly, according to the charge, and therefore the offense was not mere nonfeasance but malfeasance,

and so it was held that only an accusation by the grand jury could have authorized the Superior Court to take jurisdiction. Similar decisions are *State ex rel. Hessler v. District Court,* 64 Mont 296, 209 P 1052, and *State v. Beazley,* 77 Mont 430, 250 P 1114.

Neither these nor any of the other cases cited by the defendant are pertinent to the question of admissibility of evidence presented here. They do not involve such a question nor support the claim that, where the charge is nonfeasance, evidence of a corrupt motive for neglect of official duty may not be relevant.

The phrase "willful neglect" in this connotation has its origin in the common law. Stephen, Digest of the Common Law (8th ed) 1947, Art 145; *State v. Winne,* supra, 12 NJ 169. Its meaning is well explained by McClellan, J., in *State ex rel. v. Martin,* 180 Ala 458, 461, 61 So 491, a case cited by the defendant. The learned justice said:

"From as full an investigation as I have been able to bestow, touching a subject about which a great deal, in text and decision, has been written, I find 'willful neglect of duty,' as employed in section 173, is an intentional failure or omission of an officer to perform a plain and manifest duty which he is able to perform when he omits to do so. Since it is impossible to intentionally omit the performance of a duty without a knowledge of the duty, the stated definition of 'willful neglect of duty' implies knowledge of the duty so omitted to be performed. But to public officers in consequence of obvious public necessity must there be always and conclusively imputed a knowledge of their plain and manifest duties. No public officer can be heard to assert in justification or defense that he did not know of the obligation assumed by, and imposed upon, him by a plain and manifest duty."

The opinion continues (180 Ala 463):

> "* * * 'Willful neglect' has long been accorded a distinct meaning and signification in the law. Unassociated the two words import a contradiction in terms, the former implying purpose, and the latter the absence of purpose.—30 A. & E. Ency. Law, p. 534; 40 Cyc. p. 947; White v. State, 123 Ala. 577, 587, 26 South. 343. In consequence the true interpretation of the expression made by their blending cannot be found in the abstract meaning of the two words when unassociated. This fact necessarily renders unimportant many adjudications defining 'willful' alone or in other relations. The meaning accorded above to 'willful neglect of duty' excludes the idea that, in order to be guilty thereof, the officer must entertain at the time an evil, bad, or corrupt motive or intent to omit to perform a plain and manifest duty."

■ But this is not to say that "an evil, bad, or corrupt intent" may not be shown on the question of "willful neglect." In any case, it would tend to prove the defendant's knowledge of the duty omitted and his intentional failure to perform that duty; in this case the evidence had a peculiar relevancy in view of the nature of the defense. And, while, as counsel for the defendant urge, malfeasance may require a corrupt motive, proof of a corrupt motive does not necessarily negative nonfeasance.

Many of the duties of a district attorney involve the exercise of discretion. As Chief Justice Vanderbilt said in *State v. Winne,* supra, 12 NJ 174:

> "There are undoubtedly many instances when a refusal in good faith to prosecute after due investigation would lack the element of 'wilfulness,' but where he willfully refuses to act, *i.e.,* without just cause or excuse, he is guilty of a breach of duty rendering him liable to indictment. The distinction

between the exercise of discretion in good faith and a willful failure to act is to be judged by his conduct in the light of all the facts and circumstances. A county prosecutor within the orbit of his discretion inevitably has various choices of action and even of inaction. This discretion applies as much to the seeking of indictments from the grand jury as it does to prosecuting or recommending a *nolle prosequi* after the indictment has been found, but he must at all times act in good faith and exercise all reasonable and lawful diligence in every phase of his work."

■ For the purpose of proving his good-faith exercise of discretion, the defendant testified without objection that he relied on advice which he had received from one of his deputies and from a well-known attorney in private practice to the effect that the Oregon statutes prohibiting gambling, rightly interpreted, are "common gamblers" statutes, that is, are intended to apply only to a gambling enterprise for profit conducted by professional gamblers. The defendant requested the court to instruct the jury, in effect, that if he acted "in good faith but without corrupt motives or influences" this would be a defense, and the court instructed that "the mere personal knowledge or information of the District Attorney of a violation of the gambling statute is not sufficient in and of itself to base a conviction of the defendant in this case, if the District Attorney is acting with honest discretion and with a full knowledge of what the conditions are and the circumstances surrounding the particular incident."

In these circumstances, it would be a strange rule which would withhold from the jury evidence that the defendant knew that the gambling, although partly for charitable purposes, was in fact as well an enterprise

for profit conducted by professional gamblers, in which he himself had a financial interest.

■ Since the evidence was relevant, the fact that it showed the commission of a crime or crimes other than that alleged in the indictment does not render it the less competent. *State v. Wm. Lester Schleigh,* 210 Or 155, 168, 310 P2d 341; *State v. Reyes,* 209 Or 595, 630, 303 P2d 519, 304 P2d 446, 308 P2d 182. It is not open to the objection of uncertainty and remoteness which caused us to hold inadmissible certain evidence of that character in *State v. Fong,* 211 Or 1, 314 P2d 243. We think that the assignment of error is without merit.

■ A portion of Elkins' testimony not heretofore mentioned relates to an establishment known as the China Lantern. The witness was asked on cross-examination whether at the meeting at the defendant's home about Labor Day of 1955 he had not complained about letters written to the chief of police of Portland by the defendant regarding places in which Elkins had an interest. He answered:

"I came up there to talk to him. I remember it very definitely. And we were talking and he told me he, he had only made eight-five hundred dollars from a Chinese Lantern deal. I said, 'I will try and pay you $5,000 Monday but I will give it to Joe McLaughlin as the—as the thing is set up.' Which I did give it to him. Plus, I said, 'You are getting plenty out of the setup as it is.' If that is a, if that's undercover—and we discussed that there. And he said he was getting a piddling amount out of this Jack and Jill's stag."

The answer was not responsive, but the defendant made no motion to strike it. On redirect examination the prosecutor asked the witness:

"Mr. Elkins, you were asked early in your cross examination about the Chinese Lantern occasion

and you mentioned the sum of $5,000, I believe, and the sum of $8,500 in connection with Mr. Langley. Will you explain to us what that was all about."

Counsel for the defendant objected on the ground that he had not asked the witness about the China Lantern operation on cross-examination. The court, while agreeing that that matter had not been inquired into on cross-examination, directed the prosecutor to reframe his question, and the following question was then put:

"Will you tell us, Mr. Elkins, what the nature of your conversation on Labor Day, 1955, with Mr. Langley was in connection with the China Lantern."

No further objection was made and the witness answered:

"We retained a half interest, Bill Langley and I retained a half interest in the China Lantern when the people bought it, a half interest in it, any gambling that might be—after he became District Attorney he didn't want to have his twenty-five per cent, he wanted me to pay him $8500. I told him I didn't have eighty-five hundred on Labor Day but that I would give him $5,000 if I had to sell my place up in the mountains for it. I borrowed the money and give it to, to a person to give it to Bill Langley and he give it to him. So he told me. That's all."

We think the point was waived, first, by not moving to strike the witness' volunteered statement on cross-examination, and, second, by failing to renew the objection when the question asked by the prosecutor on redirect examination was reframed. This aside, the testimony was competent for reasons already given. Although the China Lantern transaction had its inception several years before, the answer bore upon Elkins' relations with the defendant in September 1955.

■ The defendant requested, and the court refused to give, an instruction embodying his contention that only common gambling is prohibited by ORS 167.505. The request included an instruction that gambling conducted by a charitable organization for a charitable purpose is not a crime, and that "none of the persons engaged in carrying on gambling for charity are guilty of a crime under Oregon Law, even though they are paid for their services by the charitable organization." The court's ruling is assigned as error.

To dispose of the assignment we need not decide whether ORS 167.505 is merely a common gamblers statute. *State v. McDaniel*, 20 Or 523, 26 P 837, seems to be inconsistent with that construction, for there a conviction for playing at faro for money was affirmed and an instruction that "betting at a game of faro is playing it, within the meaning of the law," was approved. The case of *Ex Parte Ah Yem*, 53 Cal 246—heavily relied on by the defendant here—, which involved a statute of California from which ours is said to be taken, was cited in the brief of the defendant in the McDaniel case for its holding that the statute was "applicable only to the persons who own, conduct, or carry on the game and not to those who merely bet at the game." This court did not mention the California case in its opinion, but the decision appears to be a rejection of it. And in *State v. Light*, 17 Or 358, 21 P 132, it was ruled that to bet money on a game of stud poker dealt by another was a violation of the statute, and that the dealer was an accomplice, *particeps criminis*, with the player.

These cases do not reach the other phase of the requested instruction, namely, that gambling for charitable purposes by a charitable organization is not prohibited. The argument here is that such gambling,

while it may be within the letter, is not within the spirit of the statute, and the celebrated case of *Holy Trinity Church v. United States,* 143 US 457, 12 S Ct 511, 36 L ed 226, is cited in support of this construction. It might perhaps be suggested, however, that the contention derives whatever force it may have from the discredited maxim that the end justifies the means. Here, the matter is complicated by the circumstance that the charitable organization, if such it is, enlisted the services of a common gambler to set up and operate for the time being a full scale gambling establishment. There was a joint adventure in gambling with a sharing of profits to which the gambler and the organization were parties—and the gambler's share did not go to charity. We do not see how it can be seriously contended that such an enterprise does not come within the spirit as well as the letter of the law, no matter how laudable the end sought to be achieved by one of the parties.

Beyond that, the whole argument about charitable gambling is beside the point. The defendant was not indicted for failing to prosecute Alsop or the other members of The Portland, Oregon, Paint, Varnish and Lacquer Association, but for failing to prosecute Nettleton, a professional gambler, for "unlawfully dealing, playing, carrying on and conducting as owner, proprietor and employee" certain gambling games. The charitable purposes of the Association can scarcely be said to have been shared by Nettleton. His share of the proceeds was nothing more nor less than income made by him in the pursuit of his occupation of professional gambler. And even though he had given it all to charity, that would have been immaterial. *Lairmore v. Drake and Borough,* 185 Or 239, 248, 202 P2d 473.

█ Another assignment of error presents a kindred

question. It arises out of the court's ruling which sustained an objection to a question propounded to a former deputy district attorney of Multnomah County regarding the practice of the office in previous years when complaints were received of "gambling activities such as beano or bingo or other types of gambling for charitable or philanthropic purposes." The defendant offered to prove by the witness that over a period of 11 years such gambling was not considered illegal by the district attorney's office and those who engaged in it were not prosecuted. What we have already said relative to gambling for charity is applicable to this question. It is suggested, however, that the evidence was relevant upon the question of defendant's good faith in the exercise of his discretion. As there is no evidence that defendant knew of the alleged practice or relied upon it, this argument must fail. Of course, if gambling for charity is in fact illegal, neglect to enforce the law, no matter how long continued, could not make it legal, nor excuse such failure. The rule with respect to contemporaneous administrative construction of an ambiguous statute has nothing to do with this case; nor has the rule concerning the admission of evidence of practice to show a standard of reasonable care. We quote what was said by Mr. Justice ROBERT S. BEAN in *State v. Nease*, 46 Or 433, 443, 80 P 897, a prosecution for violation of the nuisance statute by operating a pool room for betting on horse races:

"It was said in argument that this section had been on the statute books for more than forty years, and that up to this time there has been no attempt to apply its provisions to common gaming houses, and it is urged that such fact is entitled to conclusive weight as to the practical construction of the meaning and operation of the statute. If the facts assumed in the argument are true—a matter con-

cerning which we have no definite knowledge—it simply shows that the statute has been forgotten or disregarded, and affords no reason why the court should now refuse to administer the law as it is written."

The objection was properly sustained.

■ The defendant filed a motion for a new trial, one of the grounds of which was alleged misconduct of the jury and the prosecution. On the first day of the trial, which commenced April 9, 1957, during a recess of the court and before selection of the jury had been completed, the defendant went into the judge's chambers where he was arrested on charges contained in two indictments returned by the grand jury that day. One indictment was for perjury, the other for maliciously procuring a search warrant. The defendant's bail was approved and he was released from custody and the examination of the prospective jurors was resumed. It is alleged in an affidavit of one of the defendant's attorneys in support of the motion that the indictments were returned and the arrest made on that day and in those circumstances for the purpose of prejudicing the defendant's case; that the incident was well-known in the corridors near the courtroom where the defendant was being tried, and, as the affiant believed, that prospective jurors had knowledge of it; that the early afternoon and evening editions of the newspapers appeared on the streets carrying large headlines publishing the fact that the grand jury had indicted the defendant for perjury, and that these papers were accessible to the jurors. Photostats of editions of the Oregon Journal and The Portland Oregonian are attached to the affidavit. The city edition of The Oregonian, which is a morning paper, dated April 10, 1957, carried a headline which extended across five columns of the first

page reading "New Indictments Returned as Trial of Langley Begins" and below in the right-hand column preceding the story a headline reading "Jury Adds Perjury to Counts." The Journal, an afternoon paper, also dated April 10, 1957, carried a headline on the first page which extended the entire width of the paper and which read, "D. A. Faces New Counts." The story appeared in the two right-hand columns.

In an affidavit of another of defendant's attorneys, it is averred that the arrest of the defendant in the judge's chambers was "photographed by moving picture and television cameras and the scene was made a part of at least three television news programs on the evening of April 9, 1957, and all of said programs could have been seen, and probably were viewed, by the jurors impaneled to try the defendant."

Selection of the jury was completed at 5:20 o'clock P. M., and the court, before excusing the jury, instructed them to report the next morning at 9:30 o'clock A. M., and that thereafter during the remainder of the trial they would not be permitted to separate and should come prepared to spend the nights at a hotel. The court also gave the jury the following admonition:

> "Now, up until tomorrow morning I think I have nothing more to say to you other than what I have already said about discussing the case. That is very important. As I said earlier, you are not to read any newspapers at all concerning anything about this matter whatsoever. You are being trusted now as citizens of this community and of this country, and under your oath and obligation it's your duty, your bounden duty, to follow the instructions of the Court along that line. So I would—I am putting the utmost faith in you that you will not attempt to get any outside information at all from any source except what you hear here in the court room that is admitted properly by the Court."

In addition, before the examination on the voir dire commenced, the court warned the prospective jurors against reading anything in the newspapers concerning the case and against talking about the case or permitting anyone to talk to them about it, and the warning was repeated during a recess before the examination of the jurors was completed.

Although all the events above recounted were known to the defendant and his counsel at the time they occurred, no objection, motion or other complaint concerning them was made to the court until after the verdict of the jury was returned. They were then, along with other grounds, made the basis of a motion for a new trial.

No attempt was made to show that any juror had read the newspaper accounts of the indictments or had learned about them by radio, television, or from any other source. The averments in one affidavit that "I verily believe and therefore allege that the prospective jurors had knowledge of the aforesaid occurrence," and in the other, that the television programs referred to were probably viewed by the jurors, are no substitute for evidence. Whatever may be thought of the propriety of the prosecution's action in causing the arrest of the defendant during the trial—and we can see no reason whatever why it could not have been deferred until after the trial—the incident, with its attendant newspaper publicity, could not be deemed sufficient ground for a new trial unless it was shown that the jurors, or some of them, were aware of it and that the defendant was thereby injured, or at least that the court would be unable to determine with reasonable certainty whether the result was affected or not. *People v. Stokes,* 103 Cal 193, 37 P 207, 42 Am St Rep 102; 39 Am Jur 100, New Trial § 86.

■ Here we are asked to assume without proof that the jurors violated their oaths and disobeyed the court's instructions. This we cannot do. We quote what was said in a similar case by the Supreme Court of New Jersey in *State v. Curcio*, 23 NJ 521, 527-528, 129 A2d 871:

> "During the course of the trial two local newspapers reported that Curcio had been twice convicted on narcotic charges, a fact which the jury could not learn unless Curcio had testified and his credibility had been attacked on this basis. N.J.S. 2A:81-12. From the start of the trial the court took pains to caution the jury against reading newspaper accounts of the trial. A mistrial was moved and refused. Counsel for the defendants did not poll the jurors to determine if any had read the articles. Nevertheless, we are asked to assume that the men and women of this jury disregarded the court's instruction and read the account, and thereby became so prejudiced against all the defendants that a tainted verdict could be the only result. We will not indulge in such unfounded assumptions. To hold otherwise would not only unfairly impugn those who conscientiously serve the high responsibility of jury duty but it would also gauge the integrity of a trial to the character of the newspaper coverage."

The case here is much stronger, for in the New Jersey case the defendant at least had moved for a mistrial.

■ In any event, the denial of the motion presents no question for this court's consideration. While the trial judge has a certain discretion, which will not be disturbed on appeal except for its abuse, to grant a new trial, even in the absence of an objection or exception, for irregularities in the proceedings which deprive a party of a fair trial (*Hays v. Herman*, 213 Or 140, 322

P2d 119; *State v. Bosch*, 139 Or 150, 154, 7 P2d 554; *Veazie v. Columbia Etc. R. R. Co.*, 111 Or 1, 224 P 1094), yet the rule is that when a party having knowledge of an error or an irregularity during the trial fails to call it to the attention of the court and remains silent, speculating on the result, he is deemed to have waived the error, and the denial of a motion for a new trial based upon that ground presents no reviewable question. *Schafer v. Fraser*, 206 Or 446, 489-490, 290 P2d 190, 294 P2d 609; *State v. Foot You*, 24 Or 61, 68, 32 P 1031, 33 P 537.

The only exception to this rule which this court has ever made is where the record discloses manifest error that injuriously affected a party's right to a fair trial. See *State v. Nodine*, 198 Or 679, 686, 259 P2d 1056. We cannot say that that is the posture of the present case.

■ The defendant assigns as error the action of the court in permitting over his objection the taking of photographs in the courtroom during the proceedings.

The question first arose during the opening statement of Mr. K. C. Tanner, one of the attorneys for the defendant. He interrupted his statement to the jury to address the court, and the following occurred:

"[MR. TANNER.] Now, your Honor, I am going to have to of necessity invoke a rule of this Court, rule 69, with respect to these people of— if I am going to be interrupted by this camera that is being at my back. It is disconcerting, your Honor, and I—

"THE COURT: I didn't see or hear anything.

"MR. TANNER: Well, I did. It is this gentleman here in the rear that's making this—something that I apprehend is not contemplated by law. I would like to try this lawsuit without the disturbance, your Honor, and I think rule 69 protects me in that request.

"THE COURT: I don't think you are that sensitive to publicity.

"MR. TANNER: Well, I have a feeling that this sort of thing is disconcerting and it has a tendency to take our minds off the issues that's involved here."

After a recess and immediately before the first witness was called the following occurred:

"MR. CARNEY [attorney for the defendant]: Please, your Honor, before the first witness is called we should like to make a motion.

"Just before the Court entered the room and as the jury was in its place there were cameramen, five or six of them, with flash cameras, with movie cameras, and with other cameras, taking photographs of the jury and of the defendant and the participants in this trial.

"Now, your Honor, at the very outset of this case we wished to make a motion—they have had their photographs already—but we wish now to make a motion that the cameramen be excluded from within the bar of the court and, indeed, from within the courtroom because we want a fair trial here. And it's—and leaving the cameramen in the courtroom, within the bar of the court, taking pictures as this case progresses is going to have an effect upon the jury, upon the witnesses and upon the defendant, and it is going to be a denial of his right to a fair trial.

"We move they be excluded, your Honor.

"THE COURT: You think the taking of pictures of the jury is going to change the jurors' minds about anything.

"MR. CARNEY: It is going to lend to the jury an idea that the newspaper people—

"THE COURT: I am not going to argue this in open court. You can take that up with me in chambers at some time."

Again the transcript discloses the following during the direct examination of the witness Elkins:

"(Photographer taking movies.)

"MR. TANNER: Now, your Honor, I don't know why we have to be subjected to this noise. Your Honor wouldn't allow any talking in this court room.

"THE COURT: I don't hear anything.

"MR. TANNER: And I am sure, your Honor, this is just as noisy and just as annoying.

"THE COURT: You must—

"MR. TANNER: These people turn on these cameras to make a show out of this trial and we think, your Honor, it is a denial of due process and we think, your Honor—and we so move at this time that these newspaper people take their place behind the rail in accordance with the rules of this court.

"THE COURT: Well, I—first of all I haven't heard anything and I hear pretty well, I noticed that you don't hear too well either, so it must have been loud if you heard it. I didn't hear anything.

"MR. TANNER: Well, I made my motion.

"THE COURT: The rule has been that as long as the—of course, you don't mean to eject the newspaper reporters out of here, do you?

"MR. TANNER: I—no, I want them behind the rail in accordance with the rule and then they won't annoy me. This person (indicating) has been using a machine right at my ear and I have trouble hearing when that machine is running. It is a—it's a mechanical device that makes a noise and it, it interrupted me when I was making my opening statement to this jury, and I called that to the attention of the Court.

"THE COURT: They have been told that they cannot take any picture here with any flashlights,

with any machine that makes any noise whatever. Now if they are violating that, they are not allowed in here, that's all.

"Now, if anyone has a machine here that requires a noise in order to take a picture, they are not allowed to take one in this court room.

"MR. TANNER: Well, your Honor, what about these people, these machines that make this noise (indicating)?

"THE COURT: I don't hear—

"MR. TANNER: That device—

"THE COURT: I don't know, I don't hear any. I haven't heard anything.

"MR. TANNER: Well, there is one right at my —on the right side and behind the rail.

"Now, your Honor, I, I have—your Honor has, knows the rule of this court about people that are allowed behind this rail and newspaper—

"THE COURT: Yes.

"MR. TANNER:—reporters are not among those people that are allowed behind the rail.

"THE COURT: Yes, and there are people sitting on the benches here now, and have been for years, that are not within the rule of the court.

"MR. TANNER: Well, your Honor, as far as I am concerned I am invoking the rule.

"THE COURT: That there is hardly anybody inside the rail that—

"MR. TANNER: Well, the lawyers are very definitely not—

"THE COURT: Yes. After all, if we invoke the rule, there won't be anybody—

"MR. TANNER: As to who is allowed behind the rail.

"THE COURT: Go ahead with your question.

"MR. TANNER: Well, at this time I take it that my motion is denied?

"THE COURT: I haven't made any ruling on the motion.

"MR. TANNER: I move—beg pardon?

"THE COURT: I have made no ruling at all. I have told you what I told the photographers, that if they are disobeying it they will be in contempt of the Court.

"MR. TANNER: Well, I have moved the Court to require that people that are not entitled to be behind the rail of this court to place themselves behind the rail at this time.

"THE COURT: You make out a list of those whom you are talking about. Let me see it.

"MR. TANNER: May I have that rule?

"THE COURT: I know what the rule says. I know what the rule says.

"MR. TANNER: Well, your Honor, I move that everyone except counsel in the case, the parties in the case and the court attaches and the witnesses and those, of course, that are a part of the court, the jury, shall be removed behind the rail. That is what the rule contemplates and that includes—there are a lot of people here and that takes in, that takes care of newspaper people.

"THE COURT: What do you mean 'takes care of newspaper people'?

"MR. TANNER: Well, it puts them behind the rail so that they won't continue to disturb this trial.

"THE COURT: Will you show me a place behind the rail for them?

"MR. TANNER: Well, your Honor—

"THE COURT: In other words, you are by your motion—

"MR. TANNER:—I don't think that I am required to provide a facility for them. If I have—

"THE COURT: I don't know, but this is a public affair, the public is interested in—

"MR. TANNER: I realize that.

"THE COURT:—court procedure, whether it is criminal or civil, either way, and until there is some, something to disturb the demeanor of the Court they are going to be permitted. If they disturb the demeanor of this Court, then they will not be permitted. So far the Court has seen nothing that is disturbing the demeanor of this Court so your motion is going to be overruled at this time.

"MR. TANNER: Well, and—

"THE COURT: and you may have an exception.

"MR. TANNER: And at this time the defendant invokes the protection of the Constitution of the United States which provides that no person shall be deprived of his liberty without due process of law, and the permitting of the people in the court to disturb counsel in the presentation of the case and in hearing the evidence is a denial of the defendant's right to a fair trial as guaranteed by the Constitution of the United States, the protection of which the defendant now invokes.

"THE COURT: Go ahead."

After the verdict was returned the defendant filed a motion for a new trial based in part on these rulings and supported by the affidavit of Mr. Tanner, which reads as follows:

"I, K. C. Tanner, being first duly sworn on oath depose and say:

"That I am one of the attorneys for William M. Langley, the defendant in the above entitled cause. That I make this affidavit on Mr. Langley's behalf and in support of his motion for a new trial, and in that behalf say: That when the trial opened there were numerous newspaper reporters and photographers in attendance upon the trial and were seated and standing in various places within the rail of the court room. That during my opening

statement I was interrupted by the clicking noise of a camera, which I verily believe to be a moving picture camera, and protested such occurrence to the Court. That thereafter and during the course of the trial I was interrupted during the examination of a witness by the clicking noise of cameras, which I believe to be moving picture cameras. That I moved the Court for the enforcement of Rule 69 of the rules of this Court and requested that all persons not privileged by the rule be excluded from behind the rail; that said rule provides as follows:

" 'Rule 69. During the trial of any case or the presentation of any matter of the Court, no person shall be permitted within the bar of the court room proper other than attorneys, court attaches, litigants, and witnesses called to the stand. This excludes members of the family of litigants.'

"That my motion was denied and I thereupon invoked the protection of the Constitution of the United States and asserted that the defendant, William M. Langley, was being denied a fair trial in accordance with the laws and constitution of the State of Oregon and of the United States.

"That thereafter and while I was arguing the case to the jury, I was facing one Eddie Lee, a photographer for the Oregon Journal and for Life Magazine. That the said Eddie Lee during the hour and fifteen minutes in which I was addressing the jury, stood on the left end of the jury panel and substantially the same position with respect to the other jurors as that occupied by the alternate juror who was sitting on the right end of the jury panel. That during the entire time of my argument, I was required to face the camera of Eddie Lee who took, so I am informed by him, more than twenty-five pictures of me during said argument. That the presence of said photographer was disconcerting, that my mental processes were impaired, and that I would have appealed to the Court for protection against said photographer had it not been for the ruling which the Court had previously made with

respect to permitting persons other than those allowed by Rule 69 to remain within the rail of the court room.

"K. C. TANNER"

On November 17, 1952, this court approved and adopted Canons of Judicial Ethics which had previously been adopted by the Oregon State Bar on September 28, 1935, and are for the most part identical with the Canons of Judicial Ethics adopted by the American Bar Association. Canon 34 (which is a duplicate of Canon 35 of the American Bar Association) reads:

"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room during sessions of the court or recesses between sessions and the broadcasting of court proceedings are calculated to detract from the essential dignity of the proceedings, degrade the court and create misconceptions with respect thereto in the mind of the public and should not be permitted."

There is a similar rule in the federal courts governing criminal cases. Rule 53 of the Federal Rules of Criminal Procedure, USCA Title 18, 598, reads:

"The taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court."

We take judicial notice of the controversy that has been and is now raging over this rule and the efforts of the news media—the newspapers and news magazines and the broadcasters by radio and television—to bring about its relaxation. They assert that the freedom of the press guaranteed by the First Amendment of the Constitution of the United States and in-

corporated into the Due Process Clause of the Fourteenth Amendment is infringed by enforcement of the rule.[3] One appellate court has acceded to this view, though not in the course of the decision of a litigated case. *In re Hearings Concerning Canon 35,* (Colo) 296 P2d 465. Other courts, when the question was presented for decision, have held that there is no violation of constitutional rights involved in prohibiting the taking of photographs in the courtroom while a trial is in progress, and have sustained convictions of contempt of court of press photographers and their employers, who have disobeyed the orders of the judge in that regard. *Mack Appeal,* 386 Pa 251, 126 A 679; *State v. Clifford,* 162 Oh St 370, 123 NE2d 8; *Ex parte Sturm,* 152 Md 114, 136 A 312, 51 ALR 356. Still other courts, while not passing on the constitutional question, have expressed strong disapproval of court-room photography. *Bisignano v. Municipal Court,* 237 Ia 895, 911, 23 NW2d 523; *The People v. Ulrich,* 376 Ill 461, 34 NE2d 393. In the latter case the court said:

"If there were a rule, as has been stated, it was the duty of the court to enforce it. * * * But regardless of a rule of court, we can see where grave injury might result to the defendants in a criminal case by undue importance given to the cause by the constant taking of photographs of the defendants, court officials or counsel, in a place reserved exclusively for the administration of justice." 376 Ill 469.

The court, however, was not called on to determine in that case whether the result of the trial was affected.

In the case entitled *In re Hearings Concerning Canon 35,* supra, the Colorado court, quoting from

---

[3]See Justin Miller, "A Question of Fair Trial and Free Information," 42 American Bar Association Journal 834; id. 838, "A Newspaper Man Speaks for the News Media" by J. R. Wiggins; contra, id., 843, Richard P. Tinkham, "A Question of Proper Judicial Administration."

one of its earlier decisions, said: "Here then is another case involving a conflict between liberty and authority, a conflict that is sometimes labeled 'civil rights v. the police power' or 'liberty of the individual v. the general welfare'." In our view, this language does not accurately delineate the conflicting interests. We think they are, on the one side, the inherent right and power of the judiciary as a separate and independent branch of government "to preserve the dignity of the court and the decorum of trial, thereby insuring the orderly administration of justice" (*Mack Appeal,* supra), and, on the other, the insistence upon an unreasonable extension of the right of the press to gather and disseminate news. Article I, § 8 of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

This guarantee is of the essence of our free institutions, and it is the duty, indeed the privilege of the courts to vindicate it on every appropriate occasion; but the freedom of the press is not an absolute right and "the duty and disposition of a court to accord a justly ample scope to the liberty of the press should not be carried to the point of an undue abridgment of the court's own freedom." *Ex parte Sturm,* supra, 152 Md 124. As the court said in that case, "It would be utterly inconsistent with the position and prerogatives of the judiciary, as a co-ordinate branch of government, to require submission to the judgment of a non-governmental agency as to the question of proper conduct in the judicial forums." 152 Md 121. With this statement we are in complete agreement.

Much, however, as we deplore the decision of any trial judge not to be governed by Canon 34, and, in this case, the ignoring in favor of photographers the rule of court concerning the persons who are permitted within the bar of the courtroom during the trial, the question here cannot be determined as one either of constitutional law or of policy; but the controlling consideration is whether the record discloses that the taking of photographs during the trial of this case influenced the verdict of the jury. Though the ruling was error, it was not necessarily reversible error. Canon 34 does not declare that its observance is essential to a fair trial, and it is obvious that the court cannot make such a pronouncement. The circuit judge, by denying a motion for a new trial, manifested his opinion that no prejudice had resulted to the defendant. While we do not share the judge's views respecting the propriety of court-room photography, we accord weight to his judgment upon the question before us. This is but to follow the established practice of appellate courts in like cases. *Hays v. Herman,* supra; 88 CJS 139, Trial § 52; 53 Am Jur 55, Trial § 42; 46 ALR2d 952. A careful examination of the entire record fails to discover anything that would enable this court to say that the circuit court abused its discretion in denying the motion for a new trial.

In the famous murder case of *State v. Hauptmann,* 115 NJL 412, 180 A 809, cert. den. 296 US 649, 56 S Ct 310, 80 L ed 461, which grew out of the kidnapping of Colonel Lindbergh's son, reversal of the judgment of conviction was urged because of

"the continuous newspaper activity during the trial of the case, the presence of talking-picture cameras in the courtroom and in operation during the taking of testimony, the continued presence of notables at State's counsel table during the progress of the

trial, the hue and cry constantly present immediately outside and adjacent to the courtroom * * * the crowds through which the jury of necessity must pass to and from the jury box to their quarters, all of which tended greatly to influence the jury contrary to the evidence."[4]

The confusion and disorder at the Hauptmann trial, resulting in part from the conduct of news reporters and photographers, and the "sensational" reporting of the proceedings, are matters of common knowledge and have brought down severe criticism on the administration of criminal justice in American courts. See, e.g., 42 American Bar Association Journal 843. Yet the highest court of New Jersey held that these and the other incidents recited above—some of them much more objectionable than anything that occurred in the instant case—were not sufficient to warrant reversal, particularly as the defendant did not move for a mistrial. 115 NJL 444. Here, also, it is to be observed, there was no motion for a mistrial.

In *People v. Stroble,* 36 Cal2d 615, 226 P2d 330, a capital case, the defendant claimed on appeal that he had been deprived of his right to a fair and impartial trial by improper press releases of the district attorney, newspaper publicity, and the taking of news photographs and the televising of scenes in the courtroom. The court said that it could be assumed that the photographing and televising were improper, but that there was no indication that the jury's verdict had been thereby influenced, and continued:

"As defendant points out, the bias of jurors who have been exposed to repeated sensational publicity concerning a case is likely to be unconscious; they

---

[4]Quoted from the defendant's brief in "The Trial of Bruno Richard Hauptmann" by Sidney B. Whipple, p 77.

may honestly disclaim bias and yet have unknowingly prejudged the case. But where, as here, the defendant has been represented by able and experienced counsel, the evidence of guilt is ample, and the presentation of the case in court (despite the improper taking of pictures and televising) is fair, we should not reverse because of mere speculation that the jury might unconsciously have been improperly influenced adversely to defendant in the performance of their duties." 36 Cal2d 621.

Similarly, in this case a conclusion that the jury's verdict was influenced against the defendant by the taking of photographs during the trial would be based on nothing but speculation. The rulings of the court permitting it do not justify a reversal.

The defendant was ably represented by counsel of his own choice. The presiding judge was eminently fair in his rulings on evidence and in his instructions. We are not concerned with the weight of the evidence; it was sufficient, as we have held, to support the verdict, and, in the absence of error substantially affecting the rights of the defendant, this court is not authorized to disturb the judgment.

It is therefore affirmed.

KESTER, J., resigned before this decision was rendered.

SLOAN, J., did not participate in the consideration or decision of this case.