Argued and submitted December 10, 2014, Central Catholic High School, affirmed June 22, petition for review denied November 3, 2016 (360 Or 568)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HECTOR CARRASCO-MONTIEL,
*Defendant-Appellant.*

Washington County Circuit Court
C121983CR; A154291

379 P3d 529

Ryan T. O'Connor argued the cause for appellant. With him on the briefs was O'Connor Weber LLP.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

### DUNCAN, P. J.

After a jury trial, defendant was convicted of first-degree assault and unlawful use of a weapon, and he was sentenced to 90 months' imprisonment. On appeal, he argues that the trial court erred in failing to grant a mistrial *sua sponte*, after it became apparent that one of the jurors had injected information from outside the record into the jury's deliberations. He further argues that the trial court should have sustained his objection to the prosecutor's closing argument, which, according to defendant, undermined the presumption of innocence. And, he argues that the trial court should have granted his motion for a new trial, because, among other things, the testimony of his key alibi witness was inaudible and an unidentified juror had engaged in threatening conduct toward the jury foreperson; at the very least, defendant argues, the trial court should have allowed him to subpoena the foreperson to discern exactly what happened in the jury room. For the reasons that follow, we conclude that the trial court did not plainly err in failing to grant a mistrial in the absence of a motion by either party; that the prosecutor's closing argument, viewed in context, did not undermine the presumption of innocence; that defendant cannot assign error to the denial of a motion for a new trial based on irregularities or juror misconduct that had come to defendant's attention before the verdict; and that the trial court acted within its discretion in declining to subpoena the jury foreperson.

## I. BACKGROUND

### A. *The State's Case*

Defendant was charged with first-degree assault and unlawful use of a weapon on the theory that defendant hit the victim in the face with a bottle outside of a nightclub. The charges were tried to a jury, and the state presented the following evidence at trial.

The victim and defendant first met in May 2012, in the Portland area. Although they had both moved to the United States from the same city in Oaxaca, Mexico, they were not personally acquainted in Mexico; however, the victim knew of defendant because their respective families

had some unresolved dispute there. After meeting in the Portland area, the victim and defendant socialized on a few occasions, and the victim was aware that defendant had dated a woman, Cornejo, who was a friend of the victim's family and had been one of the victim's high school classmates.

The victim and Cornejo sometimes socialized without defendant present, and the victim came to believe that defendant and Cornejo had broken up. While Cornejo and the victim were out at the same club one night, she told the victim that she did not have a boyfriend. The victim then asked Cornejo if she would date him, but she declined, saying that she "wasn't with anyone."

Subsequently, the victim saw defendant and Cornejo out at a different club, and they, along with mutual acquaintances, ended up drinking at a motel later that night. At the motel, Cornejo and defendant confronted the victim about his interactions with Cornejo. The victim tried to explain that Cornejo had told him that she did not have a boyfriend, and he showed defendant text messages from Cornejo to that effect, which caused an altercation between defendant and Cornejo, and made Cornejo angry at the victim. The situation eventually calmed down, and the victim went to bed.

The following day, the victim called defendant to "patch things up." Defendant responded that, "if he found [the victim] somewhere, then it wasn't going to be over and he was going to beat [the victim]."

Then, in the early morning hours of June 17, 2012, defendant, Cornejo, and another man stopped the victim outside a dance club in Beaverton. Defendant and the victim argued, and bystanders intervened to stop the fight. The victim then walked by himself to his truck, talking on his phone. The victim heard someone approaching and thought it was his friends. As the victim turned, he saw defendant with a bottle in his hand. The victim felt the bottle hit his face, and he then ran away and hid.

As a result of the bottle striking his face, the blood vessels in the victim's eye ruptured, scar tissue formed on

his retina, and he permanently lost some of his vision. Cuts from the bottle also scarred the victim's face.

B. *The Defense Case*

Defendant's theory was that someone else had caused the victim's injuries, and that the victim had identified defendant as the assailant as part of an effort to trigger a criminal prosecution, which would allow the victim, who was not a legal resident of the United States, to obtain a U visa. In support of that theory, defendant presented an alibi defense though Cornejo, testimony from a lawyer, James, who specialized in the intersection between immigration and criminal law, and testimony from the victim about his understanding of the U visa process.

Cornejo testified that, during the night at the motel room, she had woken up next to the victim, whose hand was in her lap, and defendant and his brother were yelling about whether the victim had touched Cornejo while she was sleeping. The victim ran out of the motel, and she did not see him again until the night at the club when the victim was injured. However, in her version of the events, defendant approached the victim outside the club and demanded an apology for what happened at the motel. After the victim apologized, defendant and the victim got into an argument that was broken up by security. At that point, according to Cornejo, she and defendant left in their car and drove toward Troutdale; she did not learn that the victim had been injured until a month and a half later, when she was interviewed by a detective.

The transcript reflects that Cornejo was difficult to hear at points in her testimony. The court, on 13 different occasions, asked her to speak up. The prosecutor, in cross-examination, told her to speak louder. And, at another point during cross-examination, one of the jurors interjected, "We can't hear."

Defendant's second witness, James, explained that the U visa program "gives victims, undocumented victims of crime a pathway to legal status by virtue of the fact that they cooperate with law enforcement and are the victim of a qualified crime." Among other things, James explained that

an investigation need not result in charges or a conviction to obtain a U visa, but that law enforcement must substantiate that the applicant was the victim of a qualifying crime. Assault, he testified, is among the qualifying crimes.

On cross-examination, the victim acknowledged that he was an unlawful resident in the United States and was aware of the U visa, and he acknowledged that he had asked someone from the district attorney's office about the U visa. On redirect examination, the victim stated that he had learned of the existence of the U visa about three months after the assault but had not yet applied for it.

## C. Closing Arguments

During closing arguments, the prosecutor told the jury that the only disputed issue in the case was the identity of the perpetrator, which essentially reduced to a credibility contest between the victim and Cornejo about whether it was defendant who committed the assault. Defense counsel agreed that the case turned on that credibility question, and he argued that the jury should not believe the victim because he was drunk and likely did not know who assaulted him. He argued that the victim named defendant as the perpetrator because he wanted to date Cornejo, held a grudge against defendant from their prior interactions, and felt pressured to identify an assailant in order to qualify for a U visa.

In rebuttal, the prosecutor characterized defendant's theory as "fiction," unsupported by any evidence in the record. After describing his view of the evidence again—and, particularly, what he viewed as the weaknesses in defense counsel's arguments—the prosecutor made comments that, in defendant's view, impermissibly undermined the presumption of innocence. Defendant objected, but the trial court overruled the objection.[1]

## D. Jury Deliberations and Verdict

The court then instructed the jury and sent them back to the jury room to deliberate. After the jury had

[1] Because, as we will later explain, we reject defendant's contentions regarding closing arguments without extended discussion, we do not quote the closing argument at length. Rather, we point out the objection to provide procedural context, including context for defendant's motion for a new trial.

deliberated for approximately two and a half hours, the court received questions from the jury that concerned Cornejo's statements to police, detective reports, and evidence of certain Facebook postings. In addition, the court received a note indicating that one of the jurors had "looked up info on the Internet last night." At that point, the court brought the jury foreperson, Smith, into the courtroom to question her under oath about the note.

Smith explained that one of the jurors, Gaul, had told the others that he had found information about the U visa process on the Internet. Smith could not recall exactly what Gaul had said, because Gaul had been yelling and multiple people were talking at once. She said that Gaul "kept giving information and I kept trying to interrupt him. And finally I said to him—I said, 'We're not supposed to be doing that.'" According to Smith, Gaul said, "'Oh, okay.' And then there was one mention of it after that and somebody else said to him, 'We—we'd better not do that.'" When asked whether she believed that the outside information had influenced other jurors, she stated that Gaul had "started a thought process" among the jurors about the U visa. When pressed further on what Gaul had said, she recalled that "the U visa had come up and whether or not it mattered because of—of family members. * * * I remember him saying, 'Yes, it does matter. Yes, it does matter.'"

The court next questioned Gaul on the record about what he had done. Gaul testified that he had not actually looked up information on the Internet but had said that "to get a reaction" from other jurors to see how they were feeling about the case. He claimed that "it doesn't involve what this case is about. It's how we felt. I did say that I seen it on the Internet, but that was not the truth. I was after—we've been arguing in there quite a bit." Gaul then volunteered that, as part of his effort to see how fellow jurors felt about the case, he had "brought other things up also that I knew for—to be a fact." He explained, "[f]rom stuff that has happened and why I was feeling the way I feel about how my verdict is going * * * I feel that there's people in there that have never been involved with Spanish people that don't understand the culture."

The court tried to steer Gaul back to the subject of the U visa information, and Gaul claimed that he told the other jurors that

> "what he[2] said in here [the courtroom] was true that [the U visa] had to go to the prosecutor to sign off on it, that that was true. Is it true? I don't know. I'm hearing from one it's not. I'm hearing from the other it is. I believe it probably is.
>
> "So that's why I said it to try to get us off of that 'cause we were—we were arguing about that part of it."

The trial court inquired whether Gaul had "only told the people that what they heard in court was true about the U visa," and Gaul's response was ambiguous. He said that he told jurors he had seen the information on the Internet, but that he had in fact watched a television show that mentioned immigration but "had nothing to do with what was mentioned in court. But I probably shouldn't have even watched that, but I did. And I just was trying to get them to get on to a different subject and to make another vote." Gaul then volunteered, as to the state of deliberations, "But it's not good. We're going to be here a while if I'm still allowed to go back in there. That's up to you."

The court then questioned Gaul about the other extra-record material to which he had alluded earlier. Gaul told the court that he had told the jurors about his own experience working for his son's business, which had employed "Spanish" people. He described an incident in which a job applicant had presented him with various false Social Security cards and residency documents, all with different names on them. He then stated:

> "So there are things that I don't feel that this jury understands about Spanish people and how much family means to them and how—how much that can affect what we hear in this courtroom and how we can believe or not believe.

---

[2] It is not clear from the context of Gaul's remarks who "he" is, but James, the predominant witness on the subject of the U visa, had testified that "there's a section of the official government form that you submit to get U visa status that actually isn't filled out by the applicant, but [is] filled out by some approved branch of law enforcement," which, in James' experience, was "most frequently the prosecutor's office."

"Some of them don't think that that matters. To me it does. The truth matters to me. I don't think I heard the truth all the way through. And I—I still feel that way and I will always feel that way.

"And that's why I told them—I said, 'My vote ain't going to change. You ain't going to change my vote.' So then I— she [Smith] requested to see—I forget what she requested, but I requested then to see the testimony of the detective if that was possible and also then we wanted to see [Cornejo's] testimony on the stand because we didn't hear it and we should've all said something.

"And you tried to make it so we could hear it many, many times over, but we didn't hear it. So is it fair for all of us to say [Cornejo's] testimony doesn't count because we didn't hear it? I don't feel that is fair. I think we need to look at it."

The court then gave the prosecutor and defense counsel an opportunity to ask follow-up questions of Gaul, and both declined that invitation.

After sending Gaul back to the jury room, the trial court expressly invited motions from the parties. The prosecutor stated that he would "defer to my opponent here on this one," and defense counsel asked for a recess to discuss the matter with defendant. The court took a recess, and, once back on the record, defense counsel told the court that he did not have "any motions really to any of the issues that we've been discussing." The prosecutor then explained that he was not going to move for a mistrial, and that "[i]f they don't want one I'm comfortable letting the jury continue to deliberate." The prosecutor acknowledged that Gaul appeared "to be moving towards acquittal" but that he had "consulted with [the victim] * * * and he's—* * * we're hoping not to have to do this trial twice. But, of course, we'll totally respect [the court's] opinion if it's different."

At that point, the trial court questioned whether it had the authority to declare a mistrial on its own motion. The prosecutor assured the court that it had that authority, but defendant interjected, "I wouldn't want to—I mean, I'd want some time to argue with whether you do or not. I don't know." The court went into recess to research that issue. After the recess, the court stated:

"We are back on the record. And I think a problem if I declare a mistrial and for some reason I'm wrong—even though I—I think this juror has got the jury so riled up that they won't be able to give anybody a fair trial, in my opinion, that if the defense does not request it—and, frankly, I think the guy's alienating the rest of the jury something awful—that it could be double jeopardy if it turns out that I'm in error. So I'm not going to declare a mistrial."

The court then sent the clerk to tell the jury that they could go home and should return the next day to continue deliberations, but one of the jurors, Makris, expressed that he was not going to come back. The court then brought Makris into the courtroom, and Makris explained that he was missing lucrative workdays and "the reason we hung up[,] they are not too valid to me." After a brief discussion with the court, Makris agreed to return the next day to perform his civic duty. After Makris left the courtroom, the court asked the prosecutor and defense counsel whether they wanted to "bring anything up on that." Neither voiced any objection to Makris returning or suggested that a mistrial was somehow required.

The parties reconvened the following morning to discuss the answers that would be provided to the jury in response to their questions from the previous day. The answers, which were eventually provided to the jury, stated:

"You have asked for [Cornejo's] statements, Detective Andler's reports and the Facebook pages that were brought up Thursday during trial. However, [Cornejo's] statements during the investigation, Detective Andler's reports, and the Facebook pages were not admitted into evidence. We cannot admit evidence after you have begun deliberating. Accordingly, I cannot provide you with those items. You must decide the case based on the evidence that has already been admitted.

"*If you wish to review [Cornejo's] testimony during court, please tell me that.* As I write this, my staff is attempting to determine whether we can replay [Cornejo's] testimony for you."

(Emphasis added.)

After the parties agreed to the substance of those answers, the court raised another matter that had come to the court's attention regarding the jury, and a corrections officer, Riley, was questioned on the record about what had transpired the night before. Riley explained that court security was contacted by the court's staff with a request to provide an escort for the jury foreperson, Smith. Riley reported that,

> "[w]hen I picked her up outside the jury room she seemed quite upset and afraid.

> "She stated that another one of the jurors blamed her for whatever happened yesterday and that when they went into the jury room he was standing up, pointing at her, yelling at her and just made her generally feel unsafe to the point that she wanted—at that point she wanted an escort in the morning back to the jury room.

> "And we made plans to do that. She called us this morning, said she felt like she was okay and could get herself into the courtroom and did so."

Riley did not have a description of the juror who threatened Smith, other than that the juror was male. According to Riley, Smith "just—she just seemed very shaken and very afraid to be in the same room with him." Riley had stationed an officer outside the jury room that morning to make sure that everyone was safe but had allowed the officer to leave because the jurors were not yelling at one another and were using "just general normal tone voices."

The parties were then given an opportunity to question Riley, and defense counsel asked various questions about who among the jurors had witnessed the security escort. Riley was not aware that any of the other jurors had witnessed the escort itself, but the court interjected that, according to a note from the bailiff, Smith had made the request for security in front of all the other jurors.

When Riley was finished describing what had happened, the court asked counsel whether they had "anything for the Court regarding what we just heard?" The prosecutor said that he did not have anything further, and defense

counsel stated, "Not at this time."[3] Shortly thereafter, the jury returned guilty verdicts on both counts (first-degree assault and unlawful use of a weapon) by a vote of 10-2. A poll of the jury revealed that Smith and Gaul were the two "not guilty" votes.

## E.  *Post-verdict Motions*

Defendant promptly prepared a motion for a new trial and supporting declaration in which he asserted four bases for a new trial: (1) Cornejo's testimony was inaudible to the jury, as Gaul explained when he was questioned by the court; (2) Gaul "repeatedly interjected matters from outside court proceedings, including information he claimed to have learned on the internet about the U Visa, and information from his work experience with Hispanic-Americans"; (3) there was threatening behavior "by an apparently pro-state juror towards Presiding Juror Ms. Smith—causing Ms. Smith to seek sheriff deputy escort to her vehicle at the end of the first day of deliberations"; and (4) the "state's argument in rebuttal violated the presumption of innocence, and improperly focused the jury's attention on the difficulty of representing a guilty client." Defendant filed that motion on the day of sentencing, and the trial court took up the motion at the sentencing hearing.

At the hearing, the court asked defense counsel why he should be allowed to raise the first two issues (Cornejo's testimony and Gaul's misconduct) when "you and your client knew all this, consulted and decided to proceed with that jury." Defense counsel candidly acknowledged that "[i]t was our hope that the jury would acquit, same as the State's hope that the jury would convict," but argued that "there is no requirement that we had—that we would need to raise that during the trial while the jury was deliberating." The trial court rejected defendant's argument, explaining:

---

[3] Later, defense counsel reaffirmed that he had nothing more for the court "at this time," but that he would "advise the Court if that changes." The court stated, "Okay. Well, now would be the time. I mean, if you need a little time to digest it, that's fine, you know." Defense counsel said that "[a] little time to digest it * * * wouldn't hurt," but defense counsel did not raise any further issues concerning potential juror misconduct before the verdict was returned.

"[T]his was all known to the defense. The defense rolled the dice; decided to go forward. You can't have your cake and eat it, too.

"The defense made a choice; and it turned out to be a choice that resulted in a guilty verdict, but it was the defense choice.

"Also the interjections that Mr. Gaul made were interjections in favor of the defendant. And I don't have any reason to believe that the other jurors were so offended by those that they—so offended by his conduct that they reacted against him by finding the defendant guilty. I just don't have any reason to believe that.

"And this does seem to be a case where, as often happens, a good night's sleep helps people become more reasonable and they all showed up the next day; and they were nice and polite with each other and reached their verdict.

"And I just have every indication that they reached their verdict based on the evidence and the law, not any ill feelings toward Mr. Gaul or anything caused by Mr. Gaul's interjecting non—interjecting things that weren't in the evidence in the case into his deliberations."

As for Cornejo's testimony, the court explained that it was "just Mr. Gaul talking. We don't know what the other jurors actually heard." The court pointed out that it had offered to replay her testimony if any of the jurors requested it, but none of them had asked for the recording.

With respect to the threatening behavior by a male juror toward Smith, defendant's argument proceeded on the assumption that it was Makris, upset at having to come back for another day of deliberation, who threatened Smith. The court, however, expressed certainty that it was Gaul who had threatened her, angry that she reported his conduct to the court. Because of that factual disagreement, defense counsel requested that the court subpoena Smith to determine who had threatened her, but the court rejected that request. The court ruled,

"Regarding the threatening behavior by a juror, that was Mr. Gaul. The presiding juror [Smith] was concerned about him. And we did get information the next day that she had called up and said she didn't really need an escort.

"In that morning, she felt fine and everything turned out to be fine. And \* \* \* it was the presiding juror and Mr. Gaul who ended up the two not guilty votes."

Last, with respect to defendant's contention regarding closing argument, the court once again ruled that the prosecutor's comments did not amount to a comment on the presumption of innocence. And, after denying defendant's motion for a new trial, the court sentenced him to 90 months in prison.

## II. ANALYSIS

On appeal, defendant advances four assignments of error, each of which we reject as follows.

### A. *First Assignment of Error*: Sua Sponte *Mistrial*

In his first assignment of error, defendant contends that the trial court erred by failing to declare a mistrial during jury deliberations after Gaul's misconduct came to light. According to defendant, the misconduct compromised his right to a fair trial; the trial court "correctly concluded that the juror misconduct had deprived defendant of a fair trial," but then erroneously elected not to declare a mistrial "because it incorrectly believed that doing so could prevent the state from re-trying defendant under the state and federal prohibitions of double jeopardy."

Defendant concedes that he did not request a mistrial, and he therefore asks that we review his claim as error apparent on the record pursuant to ORAP 5.45. The state responds that, not only did defendant fail to request a mistrial, he *strategically declined* to seek a mistrial, hoping that he would be acquitted. For that reason, the state argues, the claimed error is not plain and, in any event, does not merit the exercise of our discretion to correct it. *See State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (describing requirements for plain-error review under ORAP 5.45, including that the error be "obvious, not reasonably in dispute"); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991) (identifying factors to be considered when determining whether to exercise discretion to correct plain error).

We agree with the state that, under the circumstances of this case, plain-error review is not appropriate. It

is far from obvious that the trial court was required to grant a mistrial when (1) defendant and the state were aware that a juror had interjected extra-record material into deliberations; (2) the injection of that material arguably prejudiced the state more than defendant; (3) the offending juror's comments reasonably suggested that he would vote to acquit; (4) the parties were invited to make a motion for a mistrial; (5) defendant was satisfied with the jury and wanted to proceed with that jury, notwithstanding the injection of extra-record material; and (6) the state and victim also wanted to proceed, despite the risk of acquittal, rather than try the case a second time. We have not uncovered, and defendant has not directed us to, any case in which an appellate court—Oregon or otherwise—has held that a trial court is obligated to declare a mistrial over the informed and considered judgment of both parties about whether to proceed with the constituted jury. And, in light of defendant's later acknowledgment that he had strategically declined to move for a mistrial because "[i]t was our hope that the jury would acquit," this is not a case in which we would exercise our discretion to correct the error. *See State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007) (identifying, as an additional consideration in deciding whether to exercise discretion, "the possibility that defendant made a strategic choice not to object").

Furthermore, given defendant's lack of an objection, we do not afford particular legal significance to the trial court's remark that, "I think this juror has got the jury so riled up that they won't be able to give anybody a fair trial, in my opinion[.]" That is, in the plain-error context, we are unwilling to treat the trial court's remark as a considered ruling on the question whether defendant would have been denied a fair trial for constitutional purposes as a result of juror misconduct—a question that, for purposes of our review, would be presented on a far more developed record concerning prejudice and possible alternatives to a mistrial if the parties had actually litigated it.

B. *Second Assignment of Error: Improper Closing Argument*

In his second assignment of error, defendant contends that the prosecutor made improper comments during

closing argument that undermined the presumption of innocence. We reject that argument without prolonged discussion; after reviewing the challenged comments in context—including the prosecutor's explicit statement to the jury that "you can't have made that conclusion [that he is guilty] yet, but many of you will make that conclusion, I hope"—we are not persuaded that the prosecutor's comments impermissibly undermined the presumption of innocence.

C. *Third Assignment of Error: Denial of Motion for a New Trial*

In his third assignment of error, defendant argues that the trial court abused its discretion in denying his post-verdict motion for a new trial. He focuses on three aspects of his motion: (1) the jury's purported inability to hear Cornejo's testimony; (2) Gaul interjecting outside information into the deliberations; and (3) threatening behavior by one of the jurors toward Smith. However, because defendant was aware of each of those purported irregularities or juror misconduct during trial and nevertheless elected to submit the case to the jury, the denial of his motion for a new trial on those grounds is not reviewable.

It is well established that, "[w]hen an irregularity occurs during trial and is known to a party but the party fails to call it to the trial court's attention, the party thereby waives any objection, and the denial of a later motion for a new trial on that ground generally is not reviewable." *State v. Sundberg*, 233 Or App 77, 87, 225 P3d 89 (2009), *rev'd on other grounds*, 349 Or 608, 247 P3d 1213 (2011).[4] In *State v. Langley*, 214 Or 445, 476-77, 323 P2d 301, *cert den*, 358 US 826, 79 S Ct 45, 3 L Ed 2d 66 (1958), the court explained:

"In any event, the denial of the motion presents no question for this court's consideration. While the trial judge has a certain discretion, which will not be disturbed on

---

[4] The Supreme Court ultimately disagreed with our conclusion that the defendant in *Sundberg* had failed to adequately preserve the error, 349 Or at 615, but the court also observed that "[n]othing suggests that this is a situation where a party 'learns the facts' regarding an irregularity during trial and 'suppress[es] those facts, in the hope of a favorable verdict, and then rel[ies] upon the same facts after an adverse verdict has been returned' to file a motion for a new trial. *See Moore v. Adams*, 273 Or 576, 579, 542 P2d 490 (1975) (stating that motion for new trial should not be granted in those circumstances)."

appeal except for its abuse, to grant a new trial, even in the absence of an objection or exception, for irregularities in the proceedings which deprive a party of a fair trial * * *, *yet the rule is that when a party having knowledge of an error or an irregularity during the trial fails to call it to the attention of the court and remains silent, speculating on the result, he is deemed to have waived the error, and the denial of a motion for a new trial based upon that ground presents no reviewable question."*

(Emphasis added.)

Although defendant acknowledges that there are limitations on our review of the denial of motions for a new trial, he argues that those limitations apply only when the motion is denied *after* the entry of judgment, whereas the denial of his motion, which occurred *before* judgment, resulted in an "intermediate order" that is reviewable under ORS 138.040.[5] Contrary to defendant's assumption, the rule that the denial of a motion for a new trial is generally unreviewable does not depend on whether the motion for a new trial was filed before or after the judgment was entered. Rather, the rule derives from prudential considerations related to waiver and preservation of error, and it applies in both civil and criminal cases. *See, e.g., Turman v. Central Billing Bureau*, 279 Or 443, 450, 568 P2d 1382 (1977) ("When a party having knowledge of an error or an irregularity during trial fails to call it to the court's attention and remains silent, speculating on the result, he is deemed to have waived the error, and the denial of a motion for a new trial based upon that ground presents no reviewable question."); *Justice and Crum*, 265 Or App 635, 639, 337 P3d 840 (2014) (describing the general rule of reviewability and explaining that "[t]he fact that wife was aware of the alleged irregularity during trial and did not voice an objection creates at least that presumption that she might have intended to use that issue to seek a new trial"). The

---

[5] ORS 138.040(1)(a) provides that the appellate court may review "[a]ny decision of the court in an intermediate order or proceeding." According to defendant, that statute authorizes us to review the issues in this case, because "the trial court entered the order denying defendant's motion for new trial on March 28, 2013, well before the April 22, 2013, entry of the judgment." As we will explain, that timing distinction is irrelevant when the bases for the new trial were known to the appellant and not raised before the verdict was returned.

Supreme Court has explained the rule in terms that focus on timing with respect to the verdict, not the judgment:

"After learning of circumstances that would lead a reasonable person to suspect that a situation might exist which was inimical to a fair trial, [the appellant] had a choice to make. [The appellant] could either ask the judge to investigate the circumstances or waive anything that such an investigation would have disclosed. [The appellant] could not wait and gamble on the outcome of the case and then raise the question if the results were adverse."

*Transamerica Title Ins. v. Millar*, 258 Or 258, 262-63, 482 P2d 163 (1971).

The exceptions further prove the rule in this context—and demonstrate that reviewability does not turn on whether the motion for a new trial was filed before or after the judgment. In *State v. Evans*, 98 Or 214, 237-39, 193 P 927 (1920), the court explained that, although the denial of a motion for a new trial could not be assigned as error when based on the insufficiency of evidence, it could be assigned as error when it concerned *newly discovered* evidence.[6] Likewise, the Supreme Court recognized that the denial could be assigned as error "[w]here a motion for a new trial is based upon the misconduct of the jury *which did not come to the knowledge of the party making the motion for a new trial until after the verdict had been returned.*" *Benson v. Birch*, 139 Or 459, 467, 10 P2d 1050 (1932) (emphasis added). None of the cases applying those exceptions have ever suggested that the timing of the ruling on the post-verdict motion—that is, whether it was denied before or after entry of judgment—was dispositive; rather, the defining

---

[6] In *Evans*, the court contrasted the principles underlying the general rule with the exceptions:

"[I]t must now be accepted as an established rule that the denial of a motion for a new trial cannot be assigned as error, and will not be reviewed on appeal where the motion is based upon an alleged insufficiency of the evidence. * * *.

"Quite a different situation is created, however, where the motion for a new trial is based upon newly discovered evidence. In such a case the trial has been completed and the verdict of the jury has been returned; and the very purpose of allowing the motion for a new trial is to afford a remedy for a fact situation which becomes known after verdict, and could not with reasonable diligence have been known before the completion of the trial."

98 Or at 239.

criterion for reviewability has been whether the basis for the motion was known to the appellant before the verdict was rendered.[7]

In sum, we see no principled reason why defendant's proffered timing distinction should matter, and we therefore apply the general rule that, where a party has knowledge of an irregularity in the proceeding but fails to object on that ground, the denial of a later motion for a new trial on the same ground is unreviewable. In this case, defendant was aware of each of the three bases for a new trial that are the subject of his third assignment of error before the jury returned its verdict, and yet he did not object or seek any remedial measures from the trial court, despite ample opportunity to do so, until after the jury found him guilty. As the Supreme Court explained in *Transamerica Title Ins.*, the law does not permit defendant to "wait and gamble on the outcome of the case and then raise the question if the results were adverse." 258 Or at 263. We therefore conclude that defendant's third assignment of error does not present a reviewable question.

D. *Fourth Assignment of Error: Denial of Request to Subpoena*

In his fourth assignment of error, defendant argues that the trial court abused its discretion by refusing to subpoena Smith and conclusively resolve which juror had threatened her. *See State v. Washington*, 355 Or 612, 651, 330 P3d 596, *cert den*, 135 S Ct 685 (2014) (denial of opportunity to question jurors is reviewed for abuse of discretion). We are not persuaded, on this record, that the court abused its discretion. The trial court expressed certainty about the identity of the offending juror based on the court's personal observations of the different jurors whom it questioned;

---

[7] Much later, in *State v. Sullens*, 314 Or 436, 839 P2d 708 (1992), the court explained that the legislature, by enacting and amending ORS 138.040 over the years, had not intended to change what had been reviewable with respect to orders denying new trials based on newly discovered evidence, so the court "continue[d] to interpret ORS 138.040 as it did in *State v. Evans*, because there has since been no legislative change to the statute." 314 Or at 443. Nothing in *Sullens*, or in ORS 138.040, can be read to suggest that the legislature intended to somehow expand established reviewability principles in those cases in which denials occur before the entry of judgment.

pointed out the fact that Smith later "called up and said she didn't really need an escort," and that, by morning, "she felt fine and everything turned out to be fine"; and noted that Smith ended up being one of the two acquittal votes. Under those circumstances, the trial court acted within the range of permissible outcomes when it determined, in effect, that further inquiry of Smith was not justified in light of the competing policy rationales of "freedom of deliberation, stability and finality of verdicts and protection of jurors from annoyance and embarrassment after they have performed their civic duty and rendered a verdict." *Koennecke v. State of Oregon*, 122 Or App 100, 103, 857 P2d 148, *rev den*, 318 Or 26 (1993).

Affirmed.